INVESTMENT ASSOCIATES, INC., a corporation organized and existing under the laws of the State of Delaware, JACOB K. NEWMAN, JR., ROBERT J. LEVY, and SERGEI S. ZLINKOFF,

vs.

STANDARD POWER AND LIGHT CORPORATION, CHAPMAN REID and LOUIS A. SEAGRAVE.

*New Castle, August 16, 1946.*

*John J. Morris, Jr.,* of the firm of Hering, Morris, James & Hitchens, (Sergai S. Zlinkoff, and Herbert L. Barnet, of the firm of Hays, Podell & Shulman, of New York City, of counsel), for petitioners.

*Howard Duane,* (Murray Taylor, of Seibert & Riggs, and H. Preston Coursen, of Pruitt, Hale and Coursen, all of New York City, of counsel), for defendants.

SEITZ, Vice-Chancellor. The ultimate object of this litigation is to determine whether the class B common stockholders of Standard Power and Light Corporation (hereinafter called Standard) elected the two directors they were entitled to elect at the annual stockholders' meeting held May 7, 1946.

This petition under *Section* 31 of the *General Corporation Law, Rev. Code* 1935, § 2063, to review the May 7 election is confined to the election of the two directors which the class B common stockholders were entitled to elect under Standard's certificate of incorporation. I might add that the class B directors constitute a minority of the entire board. The petition was filed by the registered holders of 12,000 shares of common series B, among whom are J. K. Newman, Jr., and Robert J. Levy, nominees for the class B directorates. The petitioners collectively will hereinafter be referred to as "opposition" and the defendants collectively will be referred to as "management".

The pleadings reveal that the capital structure of Standard, a Delaware corporation, authorizes, *inter alia*, the issuance of 500,000 shares of common stock series B of which 110,000 were outstanding at the time of the meeting here involved.

It is not disputed that under Standard's certificate of incorporation (hereinafter called certificate) the holders of the common series B, under terms here to be decided, had the right to elect two directors. The individual defendants, Chapman Reid and Louis A. Seagrave, were elected class B common directors at the annual election held in 1944, and held over in 1945 because it was concluded that no duly qualified successors were elected.

At the 1946 election here involved, the defendants Reid and Seagrave were the nominees of the management group, while the petitioners Newman and Levy were the nominees of the opposition group for the two positions.

The pleadings reveal that the inspectors of election found that Reid and Seagrave each received 40,828 votes while Newman and Levy each received 42,519 votes of the common stock series B.

After receiving this report, the chairman of the meeting ruled that the election of successors to Reid and Seagrave, the then class B directors, had failed because no nominee had received "the vote of a majority in number of shares of Common Stock Series B issued and outstanding" as— in the chairman's opinion—was required by the certificate. The opposition challenges the construction placed on the certificate by the chairman of the meeting, and this constitutes one of the three points for decision.

The second point of controversy centers around a proxy for 9,847 shares of class B common given by the registered owner Ladenburg, Thalmann & Co. These shares were voted for the opposition nominees and were counted by the inspectors. However, the management group contends that the proxy was solicited by the petitioner, Newman, in violation of certain designated rules and regulations of the Securities and Exchange Commission, and as a consequence, the petitioner, Newman, does not come into equity with clean hands.

The third point of controversy involves various rulings of the inspectors of election on several proxies. Some of these rulings are attacked by the management and some by the opposition. These proxies and the attacks thereon will be considered separately. At the hearing, both sides were permitted to question the validity of proxies which were not strictly within the scope of the pleadings. While this procedure was objected to, I felt that in a proceeding under *Section* 31 the formal pleadings should not, within reasonable limits, be permitted to defeat what I consider to be the real purpose of a *Section* 31 proceeding, namely, to ascertain within reasonable limits the expressed will of the stockholders.

I turn now to the first point for decision. Does Article Fourth of the certificate require nominees for class B directors to receive the votes of a majority in number of the class B shares issued and outstanding before they are elected, or does it only require them to receive a majority in number of the votes cast in person or by proxy?

Preliminarily, it is conceded by both groups that under Article Eighth (11) of the certificate, a quorum was present at the 1946 meeting for the purpose of electing class B directors.

The parties part company, however, on the vote the directors are required to receive by Article Fourth in order to be elected. The opposition group contends that Article Fourth, although requiring a majority in number of the issued and outstanding shares to *vote* before class B directors can be elected (which is the same number required for quorum purposes) nevertheless, does not require that a majority must vote for particular nominees. They say, on the contrary, it incorporates the usual rule that a majority of the shares voting may *elect* the directors. The management insists that Article Fourth explicitly requires nominees for directors to receive the vote of a majority in number of all the shares issued and outstanding before they can be elected.

Article Fourth, in so far as pertinent, provides:

"The holders of the Common Stock shall have the right by the vote of a majority in number of shares of the Common Stock issued and outstanding to elect a majority in number of the full Board of Directors of the corporation, such majority to consist of the smallest number of directors sufficient to constitute a majority in number of such full Board of Directors, and the directors so elected shall be known as Class A directors.

"The holders of the Common Stock Series B shall have the right by the vote of a majority in number of shares of the Common Stock Series B issued and outstanding to elect a minority in number of the full Board of Directors of the corporation, such minority to consist of the largest number of directors which will constitute a minority

in number of such full Board of Directors, and the directors so elected shall be known as Class B directors."

Because the language under consideration is also employed in Article Fourth of the certificate with respect to the directors to be elected by the common stockholders, it is apparent that my conclusion as to the meaning of the provision with respect to the series B common will necessarily have broader implications. I point this out because emphasis is placed on the fact that we are here concerned only with the class B directors.

To pin point the argument, I must decide what the following language means:

"The holders of the Common Stock Series B shall have the right by the vote of a majority in number of shares of the Common Stock Series B issued and outstanding to elect a minority in number of the full Board of Directors * * *."

The quoted language to my mind imposes a requirement that a majority in number of the issued and outstanding series B common stock must be *voted* before class B common directors can be elected. The import of this language, and my conclusion with respect thereto must be sharply distinguished from the language of Article Eighth (11) of Standard's certificate which requires the *presence* for quorum purposes of a majority in number of the shares of the class B common before the stockholders are entitled to vote for the election of class B directors. The coincidence of a majority requirement both for quorum purposes and as an additional prerequisite to a valid election of class B directors does not alter the fact that the provisions serve totally independent purposes. Stock may be present for quorum purposes and yet not be voted. I emphasize this fact because it was suggested by the management that the construction—if construction be needed—which I have placed on the quoted language would render it a second and identical quorum requirement, but such a suggestion fails to give effect to the distinction between a quorum requirement and the additional condition to a valid election, which

I have concluded is imposed by Article Fourth of the certificate.

It is not suggested that a provision in the certificate requiring the vote of a certain number of shares as a prerequisite to a valid election is illegal or otherwise objectionable. At least in my opinion, no successful attack can be made on a provision requiring the vote of a majority in number of the shares before corporate action is valid. Such a requirement when properly adopted seems to have the approval of the *Delaware Corporation Law,* see *Section* 5 (8) *and* (11), *Rev. Code* 1935, § 2037, *subds.* 8, 11, and it appears to be otherwise unobjectionable. See 5 *Fletcher Cyc. Corp., (Perm. Ed.)* § 2020. I leave untouched the problem, if any as to when some such a requirement may become unreasonable.

Attention is directed to the fact that I have construed the quoted language of the certificate to require the vote of a majority in number of all the issued and outstanding class B shares before such directors can be elected. It should be noted, however, that I did not conclude that a majority in number of the issued and outstanding shares must be voted for particular nominees before they can be elected class B directors. Article Fourth does not, in my opinion, impose this enlarged requirement—as the management contends—and such being the case the usual rule applies that the vote of the majority of the shares voting when cast for particular nominees is sufficient to elect directors.

I conclude that the quoted language of Article Fourth without the need for construction requires a majority in number of the issued and outstanding shares to be voted before the class B directors can be elected, but I also conclude that the same language requires successful nominees for class B directors to receive only a majority in number of the shares voted.

If it can be said that the language in question is ambig-

uous and calls for judicial construction, then I believe certain accepted principles of charter construction reinforce the conclusion I have reached with respect to the meaning of Article Fourth. First, and foremost, the management concedes as it must that the construction of the certificate contended for by them if accepted would require successful directors to receive more votes than would be required by the usual rule. The usual rule that a majority of the votes cast is sufficient to elect is so well established that its validity seems to have been assumed in this state. *Hexter v. Columbia Baking Co.,* 16 *Del. Ch.* 263, 145 *A.* 115; See also 5 *Fletcher Cyc. Corp., (Perm. Ed.)* § 2020. When it is sought to change a common law principle—and the usual rule is such a principle, *New York Electrical Workers' Union v. Sullivan,* 122 *App. Div.* 764, 107 *N.Y.S.* 886—the charter provision employed to accomplish that purpose must be strictly construed. *Goldman v. Postal Telegraph, Inc., (D.C.)* 52 *F. Supp.* 763. This principle certainly militates against the construction of the certificate urged by the management, because the language used is at least as consistent with an intent to incorporate the usual rule as the one contended for by the management.

One who contends for a construction which will require more than is ordinarily demanded by the democratic process as applied to corporate affairs should be able to point to clear language evidencing the unusual requirement. In theory at least, the corporate enterprise is to be operated along democratic lines, and whenever a point of construction arises it seems to me it should be decided in favor of the accepted democratic procedure, unless explicit language requires a different conclusion. Judged by this approach, I find the management's suggested construction of Article Fourth unacceptable.

Even allowing for the infallibility of hindsight, I believe it reasonable to say that the drafters of the certificate could have been expected to use expressions much more suited

to the purpose sought to be accomplished had they intended to adopt the unusual rule rather than the usual rule which I have concluded is incorporated in Article Fourth.

Finally, attention is called to the rule of charter construction that where there is a choice between a construction comporting with "fairness and reasonableness" as compared with a construction which will lead to unreasonable results, the former construction will be adopted. *Holland v. National Automotive Fibres, Inc.*, 22 *Del. Ch.* 99, 194 *A.* 124. While the construction of Article Fourth suggested by the management is not so extreme as to render the principle of construction peculiarly apt, nevertheless, I believe it serves to support the construction I have placed upon the language. Under the suggested construction advanced by the management which would require class B directors to receive the vote of the majority in number of all the issued and outstanding shares, it would be possible for more than 99% of all of the issued and outstanding class B shares to be voted, and yet no class B directors elected.

The facts of the present case present to my mind evidence of the harsh result which would follow from the acceptance of the management's construction of Article Fourth. Thus, even rejecting all the contested votes, over 70,000 of the 110,000 outstanding shares were voted, which is approximately 65% of all the stock of that class. Yet under the management's construction of the certificate, no class B directors were elected. I take judicial notice of the fact that under the most favorable circumstances many stockholders will not take the trouble to vote their stock, so that I am most reluctant to construe a charter provision in such a way that the vote of over 65% of all the outstanding shares would not elect directors. These statements are not used, of course, to reject clear language having such consequences, but as a partial basis for resolving an alleged problem of charter construction in favor of what I consider a more desirable requirement.

.    I have construed Article Fourth of the certificate as incorporating the usual and ordinary rule of the democratic process as opposed to a rule which would, as a practical matter, have the effect of unduly favoring the incumbents. This would be particularly true in the case of a contest for the class B directors because it would not only require the "outs" to procure more votes than the "ins", but it would also require them to receive the votes of more than 50% of all the issued and outstanding shares before their nominees could be elected. The management suggests that such a result is desirable from the viewpoint of stability of corporate management, but the vice in such an argument is that the directors are not necessarily subject to the will of the majority of those sufficiently interested to vote which also may be an overwhelmingly large majority of all the shares. The management's construction of the certificate places the interested stockholder somewhat at the mercy of his uninterested brethren—though perhaps such criticism is not particularly cogent here because of the quorum provision of the certificate. However, I do not believe that such a practice should be encouraged or recognized by a court of equity in the absence of unambiguous language in the certificate impelling such a conclusion.

The opposition group also suggests that other provisions of the charter and by-laws support the construction which I have placed upon Article Fourth. I cannot find that other language in the certificate sheds any particular light upon the problem here involved, because at most it merely contains language which poses the same problem. Even if, as suggested, it may be proper to consider the by-laws in construing the certificate, they add little because the language employed is similar to that which I must construe.

If the language of Article Fourth can be said to require construction, I conclude that it should be construed as requiring class B directors, to be elected, to receive the vote of a majority in number of the shares actually voted at the meeting for such purpose, provided a majority in num-

ber of all the issued and outstanding class B common shares are voted.

We come now to the second point for decision. Did the inspectors of election properly count the Ladenburg, Thalmann & Co. proxy for the opposition when it was allegedly solicited in violation of a rule of the Securities Exchange Commission by one of the nominees of the opposition who is also a petitioner?

*Section* 14(a) of the *Securities Exchange Act of* 1934, 15 *U.S.C.A.* § 78n (a), makes it unlawful for any person by use of the mails or instrumentalities of interstate commerce or otherwise to solicit or permit the use of his name to solicit, inter alia, proxies in respect of any security registered on a national securities exchange in contravention of such rules and regulations as the Securities Exchange Commission may prescribe. Pursuant to this power, the Commission has adopted numerous rules and regulations among which is *Rule* X-14A—1, which in so far as pertinent, provides:

"No solicitation subject to section 14(a) shall be made unless each person solicited is concurrently furnished or has previously been furnished with:

"(a)  A written proxy statement containing the information specified in schedule 14A  *  *  *."

The management group contends that the petitioner and nominee for director, Newman, violated *Rule X—14A—*1 in that he, while subject to the Act and without issuing the required proxy statement, presumably solicited from the beneficial owner a proxy which was used to vote the 9,847 shares of common series B registered in the name of Ladenburg, Thalmann & Co. in favor of the opposition nominees. The management, therefore, contends that because of the violation the inspectors erroneously counted the proxy. As a consequence, they urge that the petitioner, Newman, does not come into equity with clean hands. The opposition on the other hand attempts to demonstrate why there was

no violation of the Act and argues that even if the Act was violated, this court will not take cognizance of such violations because an appropriate forum is designated in the Act to secure relief from any alleged violation thereof. I might say that the management group nominees will win the election under my construction of the certificate if this proxy is rejected.

The theory behind the management's attack on the Ladenburg, Thalmann & Co. proxy is not entirely clear to me. They seem to contend principally that the alleged violation of the quoted rule of the Securities Exchange Act places the petitioner, Newman, in the position of one coming into equity with unclean hands. I think it clear that such a contention, even if proved as to Newman, would in nowise prevent the other petitioning stockholders from maintaining the present action—where they are not similarly situated —and this they have done so that the validity of the election must be determined.

If, however, the management contends that the proxy solicited allegedly in violation of a rule promulgated by the Commission should be rejected by this court in a *Section* 31 proceeding only because it violates such rule and not because it would be vulnerable under Delaware law, then I am called upon to decide a problem where direct precedent is almost totally absent. While it is difficult to see how this is so much a question of clean hands—as the management contends—as it is one of enforcing a federal law under the comity doctrine, nevertheless, I shall decide the matter.

The legal question to be resolved is this: Will a Delaware court in a *Section* 31 proceeding take cognizance of and grant relief for a violation of the Securities Exchange Act and rules and regulations promulgated thereunder? It may be noted that I leave aside the far reaching implications of this question as it may involve the duties of the inspectors of election, and the extent of the relief which

could be granted if the question were to be answered in the affirmative.

I feel that *Section* 27 of the *Securities Exchange Act of* 1934, 15 *U.S.C.A.* § *78aa,* provides a complete answer to the question posed. That section in effect provides that the federal courts have exclusive jurisdiction in connection with actions to enforce its provisions. It reads:

"The district courts of the United States, the Supreme Court of the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. * * *"

A recognition by this court of the alleged violation would run contrary to *Section* 27 restricting actions to enforce the Act to the federal courts exclusively, because it would amount to an indirect enforcement by this court of a "duty" created by the rules and regulations adopted by the Commission under the Act. The fact that the violation is used as a defense in the present action in the sense that it is sought to be employed as a basis for rejecting a particular proxy cannot and does not obscure the fact that this court would be assuming jurisdiction to enforce the Act contrary to *Section* 27.

Even if it is within the power of this court to take jurisdiction and grant a remedy for an alleged violation of the Act, I feel that such jurisdiction should not be exercised. The reason for my conclusion is set out in part in

the opinion of the Supreme Court of New York in the case of *American Distilling Co., et al., v. Brown,* 51 *N.Y.S.* 2d 614, 184 *Misc.* 431, *affirmed* 295 *N.Y.* 36, 64 *N.E.* 2d 347. The case involved a suit by a private litigant in the state court of New York to enforce a remedy provided by *Section* 16(*b*) of the Act, 15 *U.S.C.A.* § 78*p,* and the question arose as to whether the state court had any jurisdiction in view of the language of *Section* 27 of the Act. Assuming, contrary to my conclusion, that a state court has jurisdiction to enforce the Act if it cares to do so, a reason advanced by Justice Pecora for construing the Act as not giving jurisdiction to the state court is more cogent when applied as a reason for not exercising such jurisdiction. He said .[184 *Misc.* 431, 51 *N.Y.S.* 2d 616]:

"Consistency of enforcement will more likely be achieved if the Federal Courts retain exclusive jurisdiction. The many involved questions such as the proper rule of damages and the amount of recovery permitted which may arise from the enforcement of § 16(b) are well illustrated in the decision in *Smolowe v. Delendo Corporation, supra.* Were each of the state courts permitted to rule upon those knotty problems, there would conceivably be numerous and varying conclusions. Efficient enforcement may be expected by insuring one rule in giving effect to the requirement of exclusive jurisdiction in the United States courts."

Although Justice Pecora was dealing with another section of the Act, his reasons are even more persuasive when applied to the rules and regulations involved in the present litigation because such rules and regulations are concerned with numerous acts of a continuing nature which would require the continuing supervision and expert competence which the Commission is in a better position to supply.

The present case points up the particular desirability of leaving questions concerning the administration of this salutary act to the federal courts. Here the opposition advances at least one question of fact and two questions of law, each of which requires a construction of the Act or its rules and regulations. Moreover, it appears to be undisputed that an agent of the Commission investigated

the facts surrounding the procurement of the very proxy under attack, and yet the Commission took no action. It might well be that if it were decided here that the facts showed a violation of the Act as this court construed it, the Commission, and the federal courts whose interpretation must be authoritative, would take a different view. While it may be urged that such a result is not unusual, nevertheless, I believe it is undesirable and should not be rendered possible, especially when an adequate remedy is readily available without this court injecting itself into the picture. Moreover, this court has no jurisdiction over the Commission, so that it might well find a violation of the Act and yet have the Commission reach a contrary result with the consequence that the Commission would not perform an act necessary to effectuate this court's decree. Even the possibility of such an embarrassing result should be avoided and is avoided by construing the Act as having no application to proceedings under *Section* 31.

As to precedent on the point under discussion, my attention has been called only to an opinion of the Court of Common Pleas of Alleghany County, Pennsylvania, *Commonwealth of Pennsylvania ex rel. Laughlin, et al., v. Green, et al.*, decided November 23, 1944, (not yet reported). The order of the lower court was affirmed in an opinion of the Supreme Court of Pennsylvania which did not discuss the particular point here involved. See *Commonwealth ex rel. Laughlin, et al., v. Green, et al.*, 351 *Pa.* 170, 40 *A.* 2d 492. The case involved a proceeding comparable to this proceeding under *Section* 31 to review a corporate election. I shall quote the pertinent language of the lower court's opinion from the copy thereof supplied me by counsel:

"There remains to be disposed of the question whether the proxy committee, representing the minority interests, violated the Federal Securities and Exchange Act or the rules and regulations of the Securities and Exchange Commission in soliciting proxies on the representation that no effort would be made to defeat any of the present directors when, in fact, it was their intention to unseat two of them. Regardless of whether or not such action was in violation of the Act

or rules and regulations of the Commission, respondents have no right or authority to challenge the action of the Judges of election in refusing to reject the votes on that ground. Only the shareholders, whose proxies had been obtained by the minority group, or the Securities and Exchange Commission would have that right, and, in the case of the latter, it could be asserted only in a District Court of the United States. * * *."

I feel that the opinion is of little aid in resolving the problem here, first because the court indicates that only those whose proxies have been obtained by the alleged violation of the Act have standing to object. A proceeding under *Section* 31 is not so restricted.

Also, impliedly, at least, though perhaps unintentionally, the Pennsylvania court indicated that a stockholder whose proxy was obtained in violation of a rule or regulation of the Commission has standing for that reason *alone* to attack the use thereof and to have it declared invalid in a state court proceeding to review a stockholder's election. As I have heretofore indicated, I cannot agree with this conclusion. However, I think it should be made clear that some acts which constitute violations of the Securities Exchange Act and the rules and regulations formulated thereunder may also be cognizable in a *Section* 31 proceeding as independent wrongs for which this court would grant a remedy, even if the Securities Exchange Act had never been passed. There are not sufficient facts set forth in the opinion of the Pennsylvania case to form a basis for a decision as to whether or not the violation of the Act would have also constituted a wrong independently cognizable by a court. Moreover, the Pennsylvania court did not see fit to discuss the problem independently of the Act.

I have taken occasion to discuss this case at length because, while I have reached the same conclusion as that reached by the Pennsylvania court with respect to the alleged violation of the Act, I have done so for entirely different reasons.

The parties agree that in the absence of the Commis-

sion's regulation alleged to have been violated, the proxy in question would be unassailable under the controlling law. I conclude that this court in an action under *Section* 31 to review an election of directors will not take cognizance of an alleged violation of the Securities Exchange Act when the action constituting the violation would be unobjectionable under the controlling law. The votes represented by the Ladenburg, Thalmann & Co. proxy were, therefore, properly counted by the inspectors of election.

The third point of controversy involves numerous proxies which were attacked either by the management or the opposition group.

The management contends that even if I should rule adversely to them on points one and two, as I have done, they were still victorious. And this is true if this court supports the management's contentions with respect to all or certain of the matters hereafter discussed.

*The inspectors' error in addition.* The management contends that the inspectors of election in computing the totals made an error in that they under-estimated the total votes received by the management by some 200. The opposition seems to contend that the management should have discovered the error sooner, if it in fact existed, so that this court should not now inquire into the matter. I cannot believe that a court of equity should in effect disenfranchise the holders of 200 shares of stock if it was proved that such votes were not counted through the error of the inspectors of election.

It does appear that there was such a miscalculation by the inspectors because the number of shares voted were checked off on the list of stockholders with an appropriate mark so that it is not difficult to verify the miscalculation. Moreover, one of the inspectors of election, when testifying before me, tacitly conceded that such an error was made. An independent calculation by the court reveals the same error. I believe the evidence supports the conclusion that

a miscalculation of 200 shares was made and therefore, 200 votes should be added to the management total.

*Helen Hall proxy.* The stock ledger of Standard used to determine those entitled to vote at the election lists a Miss Helen Hall, Morris Plains, New Jersey, as owning 1300 shares, and it also lists a Miss Helen Hall, c/o Reynolds & Co., 120 Broadway, New York City, as owning 500 shares.

Two proxies signed by Miss Helen Hall bearing the same date were presented to the inspectors of election. One proxy was on the form sent out by the management and it bore the stenciled name of Miss Helen Hall, c/o Reynolds & Co., while the other was on the same type of card, but contained no stenciling. Each proxy appointed certain persons, who were acting on behalf of the management group, as agents to vote as proxy all the stock owned by or standing in the name of Miss Helen Hall. Neither proxy purported in any way to limit the number of shares to be voted.

However, the inspectors of election counted only 500 shares, apparently because they concluded that the unstenciled proxy was a duplicate of the stenciled proxy bearing the Reynolds & Co. address. Even assuming that the Reynolds & Co. proxy was limited to the 500 shares listed on the books under that address, and such a conclusion is by no means certain, I can find no justification for concluding that the unstenciled proxy was a duplicate. The inspectors seem to have been misled by the fact that certain persons employed to handle the proxies prior to the meeting saw fit to write the sum of 500 shares on each proxy. Obviously, however, Miss Helen Hall and the recipients of her proxy cannot be prejudiced by such an error. I conclude that the unstenciled proxy should at least have been counted for 1300 shares so that a total of 1300 votes should be added to the management total. The opposition contends that this proxy is a forgery, but introduced no proof of the type which I have held under the discussion of the Frank Piserchio proxy is necessary to sustain such a charge. I

have, therefore, denied the management's motion to take further testimony because under my ruling there is no evidence which they must meet.

*Frank Piserchio proxy.* There is a management proxy and an opposition proxy each for 100 shares, signed Frank Piserchio, but the opposition proxy bears an execution date and a postmark date, both of which are subsequent to the execution and postmark dates on the management proxy. Neither proxy was counted by the inspectors of election because of what they concluded was a "variance" in the signatures. It appears that the inspectors merely relied upon the apparent variance in the signatures on the two proxies in the name of Frank Piserchio. However, the management at the hearing introduced other proxies of one Thomas Piserchio of the same city. A witness for the management, who was called as an expert, testified that in his opinion the same person who signed the Thomas Piserchio proxies (which were voted for the opposition) signed the Frank Piserchio opposition proxy. It was conceded that the same person who signed the management Frank Piserchio proxy did not sign the Frank Piserchio opposition proxy.

The management concludes from the foregoing that the opposition proxy of Frank Piserchio is obviously a forgery because it was signed by the same person who signed the Thomas Piserchio proxy, although Frank and Thomas are apparently different persons, or in the alternative, the Thomas Piserchio proxies are forgeries. The court is asked, therefore, either to invalidate the Thomas Piserchio proxies or to ignore the opposition Frank Piserchio proxy and count the management Frank Piserchio proxy.

The question presented is of the utmost importance. Since the office of inspector of election is ministerial and not judicial, *Gow v. Consolidated Coppermines Corporation,* 19 *Del. Ch.* 172, 165 *A.* 136, the question arises whether the inspectors of election properly took cognizance of what they

considered "a variance in the signatures" on the two Frank Piserchio proxies. I conclude that the inspectors of election should not have taken cognizance of an alleged variance in the absence of proof given by the person whose signature was allegedly forged. The obvious practical desirability of my conclusion speaks for itself. If inspectors of election were required or permitted to pass upon possible forgeries in the execution of proxies, their duties would last interminably. Aside from practical considerations, it seems apparent that the process of determining whether or not a forgery exists is judicial and not ministerial.

Having concluded that the inspectors of election improperly took cognizance of an alleged variance in the Frank Piserchio signatures, I am next called upon to determine whether this court will hear evidence as to an alleged forgery in the execution of a corporate proxy and if so, what proof will be required to sustain such a charge.

I have no difficulty in concluding that this court in a *Section* 31 proceeding will hear and determine an issue of forgery raised in connection with the execution of a proxy. To say that this is a court of equity is a sufficient justification for my conclusion.

We come now to the much more difficult point. What proof will be required to sustain a charge of forgery? It must be kept in mind that the court is dealing with a situation which is in many respects *sui generis*, and where the usual rules of proof must, in my opinion, not be permitted to bring about as a practical matter the disenfranchisement of those who are sufficiently interested to vote. This conclusion cannot be overemphasized, because in the case of a proceeding under *Section* 31 the court rarely has before it the person whose vote we are asked to cast aside. It is all too easy to lose sight of this fact when the court has before it only the opposing factions. Moreover, it is apparent that we cannot know whether a party has authorized another to sign his name, or has otherwise adopted the

signature as to his own. Other possibilities consistent with the valid execution of a proxy will come to mind.

I feel, therefore, that a strict rule of proof should be required in this court of those who would have a proxy invalidated on the ground of forgery in the execution thereof. Nothing less than the testimony of the person whose signature was allegedly forged should be recognized, unless such testimony is unavailable for reasons having substantial merit. Every natural impulse would be to want to disclaim a forgery so that testimony by the shareholder whose signature was allegedly forged should be readily available. In the present case, neither contesting group has seen fit to introduce any testimony of or from Frank Piserchio, and there has been no showing that such evidence was not available. In the light of this strict requirement of proof and the failure to introduce evidence meeting the requirement, I conclude that the inspectors of election should have considered the later opposition proxy as having revoked the earlier management proxy of Frank Piserchio and as having been voted for the opposition group. Consequently, 100 votes should be added to the opposition total.

*John J. Tauer proxy.* This proxy gives rise to the same problem discussed under the Piserchio proxy. I conclude that the claim of forgery is not sustainable for the reasons there given and in the absence of proof to meet the same evidentiary requirements. The additional point as to whether the management proxy bearing a later postmark time revoked the opposition proxy, even in the absence of a forgery, will be discussed under the next point.

*The postmark cases.* Generally speaking, we are here concerned with proxies without an execution date or with the same execution date given by the same person to both the management and the opposition, but containing postmarks bearing the same date but a different time of day. The issue is whether or not the inspectors should under such a state of facts recognize the postmark time as determining the later executed and therefore the valid proxy.

The question posed should perhaps be tested first by the analysis of a broader question, namely, where there are conflicting proxies, should the postmark be considered at all in attempting to determine which proxy was executed later? (The Carlson and Lane proxies actually turn on the answer to this question.) Here again, we are concerned with a practical problem. I take judicial notice of the fact that a great many stockholders fail to date their proxies. As a general proposition, there would seem to be no reason to refuse recognition to the postmark date in attempting to resolve problems of the type here involved. I imagine that there could be very little question as to which proxy was executed later in the case of two proxies from the same person where they bear postmark dates several days apart. A recognition of the proxy bearing the later date as controlling in such a situation would be reasonable and practical, having due regard for the realities.

Having concluded that it would not be unreasonable to differentiate between postmark dates indicating different days, (which means that the Carlson and Lane proxies should have been counted) the question arises whether there is anything inherently undesirable about recognizing and giving effect to the difference in time of day appearing on the postmarks of the proxies in question. Clearly, if the emphasis is to be placed on the fact that we are seeking the last clearly expressed intent of the stockholder and the postmark time does not necessarily reflect such intent, then the postmark time should be ignored, and the inspectors acted properly when they refused to count such proxies. However, if the emphasis is to be placed on enfranchisement, as opposed to disenfranchisement, plus the probable realities of the situation in most cases, then the time of the postmark should be accepted as sufficient evidence of the later expression of intent by the stockholder.[1]

---

[1] In the case of opposing proxies from the same person bearing no execution date, if the later postmark date is recognized as evidencing the later expression of intent on the stockholder's part—as seems

The benefits which inure from a recognition by inspectors of election of the postmark time as acceptable and controlling evidence of the later expression of intent by a stockholder are sufficient to recommend the rule to me. There can be no uncertainty in its application and for the most part I feel that it will reflect what the inspectors are seeking to ascertain, namely, which proxy was executed later? Proxy forms are generally mailed by opposing groups to the same address so that if they are received on the same day, they will in all probability be mailed from the same place. It hardly need be said that if a stockholder mails a proxy to one group after he has mailed one to the opposing group, the later mailing must be taken to show his intention in the matter. I conclude that the inspectors of election improperly refused to recognize the postmark time as determinative evidence of the stockholder's expression of intent.

As a consequence of my conclusion, it appears that the following proxies for the following number of shares should have been counted for the management group:

| | |
|---|---|
| John J. Tauer | 25 shares |
| Mrs. Catherine Carlson | 100 shares |
| Bertha Groves | 35 shares |
| Ida McGuirk | 4 shares |
| Angelo Pardales | 200 shares |
| Miss Teresa M. Schoen | 5 shares |
| Mary E. P. Lane | 11 shares |

*Florence C. Smith proxy.* This person gave several proxies, but one proxy which bears no postmark does have a later execution date than appears on any of the postmarked proxies given by her. Surely the later execution date pre-

---

to be the practice—and yet is refused in the case of the later postmark time, then many proxies may be counted where the elapsed time between the mailing of such opposing proxies is much less than in the case of proxies which are rejected. Proxy fights are conducted in too short a period of time to adopt a rule of law which fails to take into account the hour as well as the day.

sumably written by the party herself must supersede the postmark date appearing on other proxies. In this case it is not a balance of probabilities, but a reality opposed to a probability. We have no question here of a postmark date which conflicts with the execution date on the same proxy. The Smith proxy for 10 shares should, therefore, have been counted for the management by the inspectors.

*John Longskie proxy.* The management group concedes that a management proxy from John Longskie for 10 shares was revoked by a later opposition proxy and that the inspectors improperly gave the management slate 10 votes. However, it is pointed out that the inspectors gave 22 votes to the opposition on the John Longskie proxy, when he only owned 10 shares. Consequently, 10 shares must be deducted from the management total and 12 shares from the opposition total.

Next I shall consider proxies which the management contends were not properly voted for the opposition.

*David Howard & Mrs. Betty Howard proxy.* This proxy for 1200 shares was voted by the inspectors for the opposition. The management contends that it appears that both names on the proxy were signed by the same person. It is assumed by the management that the case of *In re Giant Portland Cement Co.*, 26 *Del.Ch.* 32, 21 *A.* 2d 697, requires the separate signatures of the husband and wife on a proxy where the stock is registered in their joint names.

The *Giant Portland* case involved stock registered on the corporate books in the name of Frank M. O'Byrne and Irene O'Byrne. Although the corporate books did not indicate it, the court found them to be husband and wife and concluded that they held the stock as tenants by the entirety. To the extent mentioned, the *Giant Portland* case is analogous to the present situation. However, the analogy ceases to exist at this point because in the *Giant Portland* case the proxy was signed only by Frank M. O'Byrne, while in

our case the proxy bears the names "David Howard & Mrs. Betty Howard." Passing over the management's contention that the proxy is in one handwriting and, therefore, not *prima facie* valid because not signed by each of the tenants by the entirety, I believe the *Giant Portland* case is not pertinent here. In our case, the proxy is signed exactly as the names appear on the corporate books, while in the *Giant Portland* case only one of the two tenants by the entirety signed the proxy. I conclude that the appearance of the names of the two tenants by the entirety constitutes a sufficient compliance with the requirements imposed by Chancellor Harrington in the *Giant Portland* case. Principles of law having desirable application to one field should not be transferred to another where they serve no useful purpose, but on the contrary tend to raise legal requirements without reason above and beyond the ordinary conduct of affairs.

I believe the proxy was *prima facie* valid and that one attacking a proxy bearing the names of both tenants must be prepared to assume the burden of demonstrating to this court that the person signing the proxy (assuming one person signed both names) was not authorized to sign for the other or that such signature was not adopted by the other person. To adopt the rule contended for by the management would be to ignore the realities without an impelling reason therefor being demonstrated. The Howard proxy was properly counted for the opposition.

*Axel Heming and Mrs. Hannah Heming and George R. Young and Gertrude Young proxies.* Each proxy was for 11 shares and was voted for the opposition. These proxies present the identical situation discussed in connection with the David Howard & Mrs. Betty Howard proxy and for the reasons there set forth the Heming and Young proxies were properly counted by the inspectors of election for the opposition.

*Lila Elliott proxy.* The management received a proxy

from Lila Elliott dated May 2, 1946 but postmarked April 18, 1946. The opposition received a proxy from Lila Elliott undated, except for the postmark date of May 1, 1946. The inspectors voted the 100 shares represented by the opposition proxy.

The question presented is whether a later postmark date on a proxy will be sufficient evidence of expressed intent so as to repeal a proxy containing a later execution date but an earlier postmark date. It is clear that the management proxy was executed long before the May 2 date which it bears because it was postmarked April 18. If the date inserted on a proxy is supposed to constitute the execution date, and I believe such is the case, then the May 2 date on the management proxy must be dismissed in ascertaining the best evidence of the last expressed intent of the stockholder. We revert to the respective postmark dates and it appears from them that the opposition proxy was postmarked May 1, while the management proxy was postmarked April 18. Under the facts and in accordance with my previous ruling, the inspectors of election properly counted the Lila Elliott proxy for the opposition.

*Geddings Davis proxy.* The management proxy from Davis was not dated, except for the postmark date of April 30, 1946. The opposition proxy from Davis was dated 4-4-1946 and postmarked May 4, 1946. Since it is undisputed that the opposition proxy material did not go out until the latter part of April of this year, it is apparent that the date of 4-4-1946 on the opposition proxy was a mistake and was meant to be 5-4-1946, which would conform to the postmark date. Under the circumstances, the later postmark date on the opposition proxy controls, and the inspectors properly counted the opposition proxy. Indeed, the management group concedes that the result reached is correct if I conclude—as I have done—that the management proxies should also be counted where they bear a later postmark date than the postmark date on the opposition proxy given by the same person.

We come finally to those sets of proxies which are attacked for reasons which will appear in the discussion.

*William A. Goldbach proxy.* The management concedes, as heretofore stated, that if I recognize the postmark time as controlling when the postmark dates thereon are the same and the execution dates the same, then this proxy for 200 shares should be added to the opposition total. Since I have reached the result stated, the concession is operative and the 200 shares should have been voted for the opposition.

*Mrs. Iradell Braun and William F. Braun proxies.* Each of these persons gave proxies to both groups and the proxies causing the dispute bear the same execution date and postmark date (a later execution date on two of the proxies is obviously a mistake), but in each case the proxy to the management bears the later postmark time. Applying the principles set forth in the postmark cases, I conclude that the Braun proxies were properly counted by the inspectors for the management.

*Mrs. Nellie Smith proxy.* Here, the latest management proxy bears the execution date of April 30, 1946 and is postmarked May 1, 1946 at 3:00 P. M. The opposition proxy was executed April 29, 1946 and is postmarked May 1, 1946 at 3:30 P. M. The opposition group contends that the inspectors improperly voted the 8 shares represented by this proxy for the management.

I think it too clear for dispute that the postmarks cannot be relied upon in determining the later expression of intent of a stockholder where the proxies bear execution dates, one of which is subsequent to the other, and where the execution dates are not in conflict with the postmark dates. The execution date inserted by the stockholder is qualitatively better evidence of the later expression of intent of the stockholder than is the postmark in such a situation. Once again it is certainty versus probability. The inspectors properly counted the shares for the management.

*Proxies signed by executors, administrators and agents without other evidence of authority attached.* 99 shares were voted for the management on proxies executed by persons who designated themselves as executors or administrators of the record shareholders without giving any additional evidence of their authority.[2] The same thing appeared with respect to the Ottinger proxy for 13 shares, except that it was executed by a person designating himself as the attorney for the registered shareholder. All these proxies were counted for the management and are attacked by the opposition on the ground that insufficient evidence of their authority to execute the proxies was presented to the inspectors and that they, therefore, should not have been counted.

It has been established in this state that an executor or an administrator has the right to vote shares registered in the name of the decedent. *Gow v. Consolidated Coppermines Corporation, supra.* The question is, therefore, whether the signature of the executor or administrator, with an appropriate indication of his capacity, is sufficient evidence of his authority, or whether something more, e.g., a short certificate, is required.

The question is one of proof before the inspectors of election. Doubtless, it would be desirable to have short certificates or other evidence of the authority of the executor or administrator presented, but should it be required as a matter of law?

If the court is correct in its rulings on the many points previously discussed, it is unnecessary to decide the matter here involved. However, since there is no logic to the order

---

[2] Short certificates showing the appointment of the executors and administrators who purportedly signed the proxies representing 83 of the 99 shares here involved have been furnished the court since the hearings. But I must determine what rule of law shall guide inspectors of elections.

in which the various proxies are considered, I feel it would be unjust to leave the point undecided.

In fact, the manner in which corporate proxies are solicited in and of itself amounts almost to a practical guarantee that the person who receives the proxy form is the one entitled to vote it. Furthermore, as Judge (then Vice-Chancellor) Pearson said in *Atterbury v. Consolidated Coppermines Corporation*, 26 *Del. Ch.* 1, 9, 20 *A. 2d* 743, 747:

"* * * the use of proxies in corporate elections should not be hedged about by restrictions which, because of practical considerations, are almost prohibitive."

While there is some authority elsewhere which would require an executor or administrator as a matter of law to attach evidence of his authority, there are also some indications that it is only preferred practice and not a legal requirement. Thus, in his treatise on Corporations, Mr. Fletcher says "If [the proxy] given by executors or administrators, a certified copy of their letters *ought* to accompany the proxy." (Emphasis supplied.) 5 *Fletcher Cyc. Corp., (Perm. Ed.)* § 2056. In any event, this is the view I prefer to take of the matter. It does not seem to me that the ruling will be an invitation to abuse and as a matter of fact, I believe it possesses almost the same qualitative authenticity as the ordinary proxy.

I conclude that the inspectors properly counted these proxies for the management, and it is, therefore unnecessary to consider the management's motion to be permitted to take further testimony with respect thereto.

Both parties have treated the Ruth Ottinger proxy voted for 13 shares as being in the same category as those involving proxies executed by executors and administrators. However, this proxy was executed "Mrs. Ruth Ottinger by Simon Ottinger, Atty.". My ruling on this proxy is the same as in the executor-administrator situation, and I say so having in mind the decision of this court in *In re Universal Pictures Co., Inc., et al.*, 28 *Del. Ch.* 72, 37 *A. 2d* 615. The situation

there involved an appraisal proceeding and is a substantial basis for differentiating it from the present case. Here the burden of proof should be on the person attacking the existence of the agency.

Since the conclusion of the hearing on this matter, I have been given a copy of the power of attorney which is certified by Ruth Ottinger, and which shows that Simon Ottinger was her attorney in fact in so far as the stock involved is concerned. However, the point I must decide, and have decided, is the duty of the inspectors of election when confronted with proxies not accompanied by written evidence of the power of the agent who purportedly executed it.

A recapitulation of the entire vote based on my rulings reveals that the opposition group received a total of 42,807 votes, while the management group received a total of 42,708 votes.

Since I have ruled that all the contested proxies should be counted, there is no occasion under my decision to order the holding of an election under *Section* 31. In my opinion, the nominees of the opposition group, Newman and Levy, were elected class B directors at the stockholders' meeting held on May 7, 1946, and should be permitted to act as such.

If, and to the extent that my conclusions can be said to be based on evidence which went beyond the pleadings as drawn, I shall entertain a motion to amend the pleadings to conform to the evidence.

A decree accordingly will be advised.

Note: Affirmed on appeal. See *post p.* 593, 51 *A.* 2d 572.