# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DON T. CLYMER and<br>BEATRICE C. CLYMER | ) | |
| | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | C.A. No. 2021-0004-SEM |
| v. | ) | |
| | ) | |
| NANCY C. DeGIROLANO and<br>JOSEPH DeGIROLANO | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

## MASTER'S FINAL POST-TRIAL REPORT

Final Report: July 5, 2023
Date Submitted: March 22, 2023

David J. Weidman, SERGOVIC CARMEAN WEIDMAN MCCARTNEY & OWENS PA, Georgetown, Delaware; *Counsel for Petitioners.*

Richard L. Abbott, ABBOTT LAW FIRM, LLC, Wilmington, Delaware; *Counsel for Respondents*.

**MOLINA, M.**

This case is a property dispute, complicated by the underlying family dynamics. Formerly close family members dispute whether the matriarch of the family transferred, gifted, or promised to gift a portion of her property to her daughter and son-in-law over 25 years ago. If so, the daughter and son-in-law argue that the matriarch's transfer of that same property to her son in 2020 was invalid and the parties to that transfer should be held liable for their inequitable conduct.

Ownership is hotly contested not just because the land is family property but because the property has commercial value—it has been the site of a roadside fruit stand for over 12 years. The daughter and son-in-law wish to continue operating that stand; the matriarch wants the growing business off her front lawn.

In this final report and on the record developed during a four-day trial, I find the daughter and son-in-law, at most, had a license to operate their business on the matriarch's property. That license was revoked, and the daughter and son-in-law do not have an enforceable future interest in the property. They are entitled, however, to reimbursement for improvements made to the property after 2009. That reimbursement should be offset, however, by the reasonable rent owed to the new property owner, up to the amount of the injunction bond. I recommend the parties meet and confer regarding the rent/reimbursement offset and propose an appropriate form of order to bring this matter, and their disputes, to a close.

1

## I. BACKGROUND[1]

The property at issue is located at 32861 Long Neck Road, Millsboro Delaware (the "Property") and is adjacent to a 70-acre farm with a farmhouse (the "Farmhouse").[2] The Property is a four-acre parcel with a residence on the back two-acres and a block building on the front two-acres (the "Front Acres").[3] Ownership of the Front Acres is in dispute.

Before I get into the ownership and use of the Property, I pause to identify the key players in this litigation. The above-referenced matriarch is Nancy DeGirolano ("Nancy"). Nancy and her husband Anthony DeGirolano ("Anthony") had six children, four boys (Gene DeGirolano ("Gene"), Anthony DeGirolano Jr. ("Tony"), James DeGirolano ("Jimmy"), and Joseph DeGirolano ("Joseph")) and two girls (Diana DeGirolano ("Diana") and Beatrice Clymer ("Beatrice")).[4] Beatrice and her

---

[1] The facts in this report reflect my findings based on the record developed at trial on December 5, 7, 9, and 13, 2022. *See* Docket Item ("D.I.") 168. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." D.I. 171-174. The Clymers' exhibits are cited as "PX __." The DeGirolanos' exhibits are cited as "RX __." All exhibits referenced herein were admitted at trial without objection. *See* Tr. 36:5-24, 999:10-1000:1. In their post-trial submissions, neither side presented objections to the exhibits admitted. *See* D.I. 175, 176, 178.

[2] Tr. 12:2-4, 12:14-16. The 70-acre farm is owned jointly by Nancy and her sister, Beatrice ("Aunt Bea"). Tr. 207:13-15.

[3] Tr. 9:22-24, 201:17-23, 796:5.

[4] Tr. 797:12-18. Diana sadly passed away several years ago from cancer. Tr. 276:24-277:3. Anthony was known by family and friends as "Muzzi." Tr. 14:14-17. I do not assume such familiarity. I refer to the parties by first name for the sake of clarity, intending no disrespect.

husband Don Clymer ("Don," and together with Beatrice, the "Clymers") initiated this action seeking ownership of the Front Acres.[5]

I address the historical ownership and use of the Property, with the relevant family dynamics, in chronological order.

### A. Pre-1997

On February 6, 1975, Nancy inherited the Property from her aunt, Radie K. Moore.[6] She did not, however, immediately use the Property. Rather, Nancy and her husband, Anthony, continued to live in their home at 341 Salem Church Road in Newark, Delaware (the "Newark Property") until the late 1980s or early 1990s.[7] While her parents lived at the Newark Property, Beatrice would "pick strawberries and other produce" and sell it off the Newark Property.[8]

Sometime before 1990, per Nancy, the State took the Newark Property and she and Anthony decided to build a new home on the Property in 1990 or 1991.[9] After a few years in their new home, Beatrice asked her parents if she could sell produce off the Front Acres, like she had done at the Newark Property.[10] Beatrice

---

[5] D.I. 1, 77.

[6] Tr. 815:2; RX 38.

[7] Tr. 204:19-20, 815:4-6.

[8] Tr. 204:14-20.

[9] Tr. 204:19-20; 815:4-6.

[10] Tr. 204:15-16.

testified that Anthony "was all for it" and that Nancy "didn't say she wasn't."[11] With that tacit approval, in or about the summer of 1996, the Clymers began selling produce on the Front Acres.[12]

The setup, at first, was minimal. The Clymers used a wagon and had tarps to protect the produce when it rained.[13] At some time, according to Nancy, the Clymers were selling out of "a little shed . . . on there" that used to store the produce.[14] But "closer to the fall, the winds got real bad."[15] Wind would knock over the carts and rain was damaging the produce.[16] According to Don, Anthony suggested the idea of constructing a block building on the Front Acres "so [the Clymers] wouldn't have an issue with everything getting blown around."[17]

## B.    The Agreement

Before any building was constructed, however, the Clymers contend that their interest in the Front Acres was memorialized. It happened in 1997, while the

---

[11] Tr. 205:15-19.

[12] Tr. 13:23-14:1.

[13] Tr. 13:23-24, 205:3-8.

[14] Tr. 802:3-9.

[15] Tr. 14:5-7.

[16] Tr. 14:6-22, 205:6-8.

[17] Tr. 14:10-22. Beatrice contends that Nancy was a part of the discussion surrounding the need for a building. Tr. 207:4-9. *But see* Tr. 797:22-798:7 (Nancy) (testifying that she believed Anthony approved the building because he "probably wanted to work" and "liked doing things like that").

Clymers were living in the Farmhouse, adjacent to the Property.[18] As close family and neighbors, the Clymers would regularly enjoy morning coffee with Nancy and Anthony at the Property.[19] According to Nancy, the Clymers were "always" at her house when they lived at the Farmhouse.[20]

On the morning of March 1, 1997, the Clymers went to the Property, much like any other day.[21] But on that morning, per the Clymers, five people were present when they arrived: Ron Simpler, Sr. ("Ron Sr."), Ron Simpler, Jr. ("Ron Jr."), Anthony, and Nancy.[22] Nancy denies being present.[23] And Nancy's son, Gene,

---

[18] Tr. 22:8-11. Beatrice explained that the Clymers originally moved into the Farmhouse because their house in Georgetown, Delaware had a tenant in it. Tr. 210:18-23. Nancy did not ask the Clymers to sign a lease and the Clymers did not pay rent to live in the Farmhouse. Tr. 801:6-10.

[19] Tr. 206:2-3, 212:24-213:2, 807:17-19.

[20] Tr. 808:7.

[21] Tr. 24:7-14, 807:3-10. Per the Clymers, Nancy called them to come down to the house on the Property. Tr. 123:20-22, 214:13-18. Don testified that it was their routine to have morning coffee at Nancy's. Tr. 15:1-3. Nancy, however, recalls that the Clymers came down that day uninvited, as they had done on previous occasions. Tr. 807:20-24. She does not recall calling them and testified that she was out shopping when the Clymers arrived at her home. *See* Tr. 854:11. To her recollection, she got to the store at 7:00 A.M. and returned home "[b]etween 9:00 and 9:30 [A.M.]." *Id.* She does, however, recall the Clymers, Anthony, Ron Sr., and Gene being at her house when she returned. Tr. 854:8-20.

[22] Tr. 95:4-8, 217:4-6. Ron Sr. was a friend of Anthony's. Tr. 206:7-10, 217:6-7, 810:15-16.

[23] Tr. 806:7-10.

5

testified that he was present, not Ron Jr.[24] Gene also testified that Nancy "wasn't home at the time."[25] Conversely, the Clymers deny that Gene was present.[26]

Per the Clymers, they walked into the group of five reviewing a document in the center of kitchen table.[27] The document was a single-page, type-written text purporting to transfer the Front Acres of the Property to the Clymers (the "Agreement"). It provided:

> Agreement dated March 1st 1997
> This agreement is between Nancy C DeGirolano and Anthony P DeGirolano and Beatrice C Clymer and Don T Clymer.
> The agreement is that Nancy and Anthony are giving the front of their property at RR #1 Box346 Longneck RD Millsboro DE 19966 for the sum of One United States Dollar. To Beatrice and Don.
> The propose [sic] of this is for Beatrice and Don to build their produce building.
> After the death of Nancy and Anohony [sic] DeGirolano Beatrice and Don will pay for subdivision of 2 acers [sic] and transfer tax.[28]

None of the witnesses who testified at trial seem to know how this mystery document came to be. Don testified that he did not know who created the Agreement and he did not own a typewriter in 1997.[29] Beatrice also denied knowing where the

---

[24] Tr. 582:1-24. Nancy could not recall if Ron Jr. was present. Tr. 854:21-855:6. She did, however, concede that the Simplers were at her house a lot. Tr. 854:24 ("[Ron Sr. and Ron Jr.] were always at my house.").

[25] Tr. 561:18-19.

[26] Tr. 25:11-20, 217:18-218:2.

[27] Tr. 24:13-14, 214:13-18.

[28] PX 2.

[29] Tr. 23:9-20.

6

Agreement came from and testified that she did not own a typewriter in 1997.[30] Nancy was also unaware of how the Agreement was created and was unsure if the Clymers or Simplers had access to typewriters or computers.[31]

The parties also dispute who signed the Agreement that morning. At the bottom of the Agreement are signatures purporting to be from Anthony, Nancy, Don, and Beatrice, with Ron Sr. and Ron Jr. as witnesses.[32] Nancy testified that she "didn't know nothing about it and that wasn't [her] signature."[33] She unequivocally denies signing the Agreement.[34] Don testified that "[Anthony] signed it and [Nancy] signed it, me and [Beatrice] signed it. And then [Anthony]'s buddy [Ron Simpler Sr.] and his son [Ron Simpler Jr.] signed it."[35]

Gene tells a different story. He recalls everybody was seated at the table with the Agreement sitting in front of Ron Sr.[36] "[Anthony] asked [him] to come into the kitchen."[37] Gene admitted that he had forged his mother's checks as a teenager and,

---

[30] Tr. 213:21-214:6. *But see* Tr. 811:16-19 (Nancy) (testifying that Beatrice had access to a typewriter while she was in school at Del Tech). Beatrice graduated from Del Tech in 2001. Tr. 231:23-232:5.

[31] Tr. 805:16-24, 811:12-18.

[32] PX 2.

[33] Tr. 856:14-16.

[34] *But see* Tr. 217:8-11 (Beatrice) (testifying that she witnessed Nancy sign the Agreement).

[35] Tr. 20-15:19.

[36] Tr. 561:3-8.

[37] Tr. 555:22-24. Gene conflicted himself regarding whether the Agreement was pre-signed when he walked into the kitchen that morning. *See* Tr. 586:2-5, 604:15-17.

because he was "good at forging [Nancy's] checks" his father, Anthony, asked if he would "forge… her name on [the Agreement]."[38]  Gene refused and all he "remember[s] is [his] mom's name being signed."[39]  Gene testified to "watch[ing] Ron [Sr.] sign the paper."[40]  During the 15-20 minutes that Gene was in the kitchen, however, he did not witness Ron Sr. practice Nancy's signature.[41]

After he witnessed Ron Sr. sign, Gene left through the back door, where he encountered Nancy returning from the grocery store.[42]  Gene did not inform Nancy of Anthony's request of him or that he witnessed Ron Sr. forge her signature.[43]  Per Nancy, she asked Gene as he was leaving "What's going on here?", Gene replied "[a]sk them."[44]

When Nancy walked into her kitchen, "Don, Bea[trice], Ron [Sr.]" were "drinking coffee, as [they] always did" and "everything got quiet."[45]  Despite her

---

[38] Tr. 555:24-556:2. *Cf.* Tr. 850:11-14 (Nancy) (testifying that Anthony was a good and honest man).

[39] Tr. 580:4-5.

[40] Tr. 562:1.

[41] Tr. 587:19-22.

[42] Tr. 562:1-6.

[43] Tr. 562:24-563:2. Gene forgot all about that day until this litigation. Tr. 588:16-17. Gene revealed his story about Ron Sr. forging Nancy's signature to his family for the first time on March 21, 2021, on a phone call with the DeGirolanos' counsel.  Tr. 601:11-602:12. Gene's convenient memory, admitted history of forging his mother's signature, and prior guilty plea for lying to a police officer, undermine his credibility. Tr. 572:14-17.

[44] Tr. 806:21-24.

[45] Tr. 807:3-18.

son's ominous warning, Nancy did not pry and it appears the parties never discussed the Agreement again, until this litigation. Don testified that after it was signed, "[the Agreement] went in the file box with the rest of the receipts."[46] Beatrice also testified to finding the Agreement with the "business receipts that [the Clymers] had on the building."[47]

## C. The Construction

After the Agreement was signed, the parties went on with their days and construction on the building began shortly thereafter. The contemplated block building was constructed between March and May of 1997 (the "Building").[48] Before the construction or seeking permits for the build, Don personally made concept drawings of the Building.[49] He envisioned and captured a three-walled structure with the "open side" facing the parking lot which affronts Long Neck Road.[50] Don estimated the Building to be 24 by 24 feet.[51]

---

[46] Tr. 27:15-16.

[47] Tr. 319:16-18.

[48] *See* PX 9; Tr. 28:22-29:1. During that time, on April 10, 1997, Nancy added Anthony's name to the deed for the Property. PX 4. Nancy testified that Anthony "always complain[ed] about not being on the deed" because he had "no say in it." Tr. 813:13-15, 815:1-2. Nancy and Anthony were, thereafter, tenants by the entirety. PX 4.

[49] Tr. 102:18-20; PX 5.

[50] PX 5, at 14.

[51] *Id.*

9

With that vision, on March 20, 1997, Don applied for a building permit with Sussex County.[52] The permit listed the cost of improvements at $7,488.00 and reflected Nancy as the property owner.[53] Once the permit was approved, construction began. The parties quibble over who did the bulk of the work. The Clymers' testimony was consistent that Don built the Building with Anthony.[54] Nancy does not, however, recall Don assisting with the construction.[55] Instead, Nancy testified that Anthony built the Building, with the help of Paul McMinn ("McMinn").[56]

McMinn's testimony, perhaps the most credible given his disinterest in this litigation, was a blend of both sides. McMinn testified that he, Anthony, and Don built the Building together. McMinn remembers "helping [Anthony] set … lintels" in the doorway.[57] McMinn recalls Anthony telling him to "[h]urry up, boy. Hurry

---

[52] PX 6.

[53] *Id.* at 16.

[54] Tr. 16:1-6, 224:6-8 ("Don and my father…built the [Building].").

[55] Tr. 861:9-11. *But see* Tr. 861:2-4 (Nancy) (testifying she "can't answer" whether Don also helped construct the Building because she "doesn't know.").

[56] Tr. 861:6-8. Don refutes that testimony. Tr. 91:11-15.

[57] Tr. 451:1-3.

up."[58] He testified to Don assisting as well, saying he did "a little bit of everything" like "labor and helping do whatever he needed to do to get the job done."[59]

The materials for the construction were primarily provided by Don. Although most materials were purchased after the Agreement manifested, Don also used materials he had purchased prior to March 1, 1997. For instance, four of the windows to the Building were purchased on February 26, 1997, while the door and a fifth window were purchased March 10, 1997.[60] During the months of March, April, and May, Don continued to make purchases necessary to complete the Building.[61] The Clymers contend that Nancy and Anthony did not pay for any of the materials to construct the Building.[62] Nancy indicated that she had no reason to dispute that the Clymers' paid for the Building to be constructed.[63]

---

[58] Tr. 451:2-3.

[59] Tr. 451:23-452:1.

[60] PX 9, at 26, 48.

[61] *See id.* at 45 (concrete), 46 (truck rental), 44 (shingles). Additional improvements were made on the Building after the produce stand opened in 1997. For example, receipts introduced at trial indicate that the Clymers purchased trash services, lumber, roof shingles, and gravel for the parking lot. *Id.* at 28-34, 37, 39-40; Tr. 40:8-43:20. The Clymers made further improvements in 1998. *See, e.g.*, PX 9, at 27. And on April 15, 1998, the Clymers purchased electricity for the Building. PX 10, at 49.

[62] Tr. 39:4-10, 223:17-22.

[63] Tr. 863:7-10.

The stand opened sometime in May or April of 1997, while construction was still ongoing; it was fully complete around June 20, 1997.[64] The Clymers called their business "Michael's Produce."[65] Michael's Produce operated out of the Building on the Front Acres in 1997, 1998, and 1999.[66] It was seasonal and would run from approximately April or May to "at least October."[67]

## D. The 2000-2001 Change

Michael's Produce ended in 2000. Following an argument between Nancy and Beatrice around Christmas of 1999, the Clymers moved out of the Farmhouse and into their current home in Georgetown.[68] Given the nature of their dispute, the Clymers stayed away from the Property and did not operate Michael's Produce in 2000.[69] The following year, Don slipped a disc in his back following a car accident and, again, Michael's Produce did not open.[70]

---

[64] Tr. 42:6-9, 46:8-10. *See also* PX 6, at 31. The Certificate of Compliance was issued by the Sussex County Building Code Department on July 24, 1997. *Id.* at 20.

[65] Tr. 34:16-18.

[66] Tr. 303:10. During this time, the Clymers were still living in the Farmhouse. Tr. 50:5-7.

[67] Tr. 47:18-22, 50:2-4, 224:23-225:2.

[68] Tr. 163:11-164:11. I decline to address the substance of their argument; why Nancy and Beatrice argued is simply not relevant to the matters before this Court. I likewise decline to dwell on the irrelevant testimony regarding the Clymers' marital issues. *See* Tr. 207:16-23.

[69] *See* Tr. 50:14-52:5.

[70] Tr. 52:10-20.

Although the Clymers were not using the Building in 2001, Nancy wanted to "get [the Clymers] out" because "[t]hey had their stuff stored in the [Building]."[71] Nancy went to the courthouse to "find out what [she] had to do to get [the Clymers] out of the [Building]."[72] Then, on June 12, 2001, Nancy asked a family friend, Vincetta Jones, to craft a letter (the "June Letter").[73] The June Letter, addressed to Beatrice indicated that: Nancy wanted "all of [Beatrice's] belongings removed from the [Building] on [the Property;]" gave the Clymers until "June 30, 2001 to remove" their items; and indicated Nancy would "be using the [B]uilding starting July 1, 2001."[74] Nancy sent Beatrice the June Letter via certified mail.[75]

Don testified that he "didn't see the [June Letter]."[76] Even if he had seen it, Don indicated that he would not have objected to Nancy using the Building; nor did he feel the need to remind her of the Agreement.[77] Don did not view the June Letter as revoking the Agreement.[78] Beatrice received and read the June Letter.[79] After

---

[71] Tr. 817:10-14.

[72] Tr. 819:10-13.

[73] Tr. 816:22-817:4, 819:8-820:6.

[74] PX 11.

[75] Tr. 819:22-23.

[76] Tr. 53:14-15.

[77] Tr. 53:11-23.

[78] *See* Tr. 54:21-23 ("We had an agreement.  I trusted them.  There was no reason for them to take the [B]uilding away.").

[79] Tr. 230:3-4.

speaking with her Aunt Bea about it, she concluded that, as the letter stated, "[Nancy] [would] be using the [B]uilding."[80]

Regardless of what the Clymers believed the nature of the June Letter to be, following its receipt, the Clymers vacated the Building without raising the Agreement.[81] The Clymers would not operate their produce stand in the Building again for nearly a decade.

## E.    The Candle Shop

After the Clymers received the June Letter and ceased operating the Business, the Building sat vacant for a number of years; Nancy never did use it.[82] But, beginning around 2002 or 2003 Leigh Ann DeGirolano ("Leigh Ann"), Nancy's daughter-in-law, Jimmy's wife, began selling candles from a cart on the Front Acres (similar to the way the Clymers began the produce business).[83] After about two years, Leigh Ann asked Nancy if she could move her candle shop into the Building.[84] Nancy agreed and Jimmy worked to refurbish the inside of the Building for Leigh Ann's needs; he framed the walls and roof, added insulation, stained the concrete,

---

[80] Tr. 230:16-231:12, 233:3-234:4.

[81] *See, e.g.*, Tr. 303:20-304:6.

[82] Tr. 518:1-2, 527:17.

[83] Tr. 539:12-23. During this time, Beatrice was suffering from certain medical ailments (2002-2004) and then assisting her Aunt Bea with various matters until she passed (2006-2009). *See* Tr. 236:16-19, 239:2-15.

[84] Tr. 539:20-23.

14

and did some decorating.[85]   He did not produce receipts or invoices for these expenditures, but a building permit application with Sussex County submitted in or about August of 2005 listed the cost of improvements at $2,500.00.[86]

The candle shop operated in the Building from approximately 2005 to 2009.[87] Leigh Ann testified that she operated the candle shop seasonally.[88]  During her tenure in the Building, Leigh Ann did not have a formal rent agreement with either Nancy or the Clymers.[89]  In lieu of rent, Leigh Ann "would pay [Nancy] 10 percent of . . . what [she] would bring in."[90]

A combination of work outside of the home and the 2009 economic downturn caused Leigh Ann to close that candle shop; "it was not as profitable as it had been in the past."[91]  "[The candle shop] started winding down … in 2009 and 2010."[92] After she left, Leigh Ann does not remember what happened to the Building, only that "[e]verything was left, all the . . . fixtures were left.  [E]verything minus the . . .

---

[85] Tr. 518:21-519:13.

[86] PX 12, at 51-53.

[87] Tr. 526:16-527:3, 542:2-3.

[88] Tr. 542:23-34.

[89] Tr. 543:10-14.

[90] Tr. 543:13-15.

[91] Tr. 543:8-9.

[92] Tr. 543:2-3.

goods that were in there."[93]  When she left, Leigh Ann gave Nancy the keys to the Building.[94]

**F.     The Clymers' Return**

The Clymers' return was prompted by Anthony's decline. In or about 2008, Anthony, who had recently underwent a heart operation and was diabetic, suffered a stroke.[95] The stroke left him partially paralyzed on one side.[96]  Don testified that after Anthony got sick, he frequently visited the Property to assist with Anthony's care.[97]  Although Nancy handled the "[m]ajority of" the work caring for Anthony, she conceded that Don "c[ame] over once in a while… to pick him up and put him in the chair."[98]

While Anthony was declining, the Clymers' produce business reopened in the Building.[99]  The business's name was changed to "Muzzi's Produce," in honor of

---

[93] Tr. 542:14-19.

[94] Tr. 829:16-18. The Clymers contend that they had keys to the Building while Leigh Ann ran the candle shop, but that they did not work because Nancy changed the locks. Tr. 318:23-319:1. During the years the candle shop operated, the Clymers did not object to either Nancy or Leigh Ann to the Building being used for that purpose. Tr. 310:1-8, 544:2-4, 824:13-16.

[95] Tr. 60:8, 868:17-19.

[96] Tr. 868:20-22.

[97] Tr. 60:7-23.

[98] Tr. 869:1-10.  Don recalls others assisting with Anthony's care such as Tony and Nancy McMinn.  Tr. 171:10-11, 171:24.

[99] Tr. 59:16-24, 242:21-243:7.

Anthony.[100] How and why the Clymers regained access to the Building is disputed.[101] Don testified that Nancy gave him the keys to the Building one day in 2009 because "the [B]uilding was leaking and it needed some work."[102] Without the keys, Don would have been unable to access and repair the Building "because the locks had been changed."[103] Don then used the keys provided to him to restart the business, without, it appears, any express permission or direction to do so.

Nancy testified that she allowed the Clymers back into the Building so that their son, Michael Clymer ("Michael"), would have a place to work following his release from jail.[104] Per Nancy, Beatrice asked if Michael could reopen the stand.[105] According to Nancy, Michael also personally asked her for permission to operate a business out of the Building.[106] After she thought about it for "a couple weeks," Nancy agreed and "gave Michael the keys to the stand."[107]

---

[100] Tr. 46:17-22. Anthony's nickname was "Muzzi". Tr. 14:14-17.

[101] *Compare* Tr. 59:19-24 ("Nancy gave [Don] the keys") *with* Tr. 829:14 ("[Nancy] gave Michael [Clymer] the keys.").

[102] Tr. 59:22-23, 60:1-4.

[103] Tr. 59:19-21.

[104] Tr. 828:16-19.

[105] Tr. 828:16-24.

[106] Tr. 829:1-6.

[107] Tr. 829:13-15.

Nancy's story is difficult to believe. She testified that she believes she gave Michael the keys in or around 2011, and that only after she gave Michael the keys did Muzzi's open.[108] Michael was released from jail in 2012, and the evidence reflects the produce stand was already operating out of the Building by 2011.[109] Further, Michael testified that he did not begin working at the Building until 2014 or 2015.[110] Michael denied that he ever requested the keys from Nancy or asked her to reopen the Business.[111] Michael also denied that he needed a job when he got out of jail in 2012 and said that he went to work for "1995 Property Management" upon his release.[112] Disputes aside, all agree that as of at least 2011, the Clymers were running Muzzi's out of the Building.[113]

After the Clymers retook possession of the Building, Muzzi's underwent an expansion in the types of goods it sold, "selling more jar goods… concrete statuary and fire camp wood."[114] The primary operator was Don, who was present at Muzzi's

---

[108] *See, e.g.*, Tr. 829:13-22, 870:11-18, 827:14-20.

[109] Tr. 363:7-10, 871:6-9.

[110] Tr. 442:19-21.

[111] Tr. 363:22-364:7.

[112] Tr. 363:14-21.

[113] Tr. 59:19-24. Anthony died on August 21, 2011. Tr. 827:1-2; RX 26. Don was present when Anthony died. Tr. 95:18-20; RX 26.

[114] Tr. 62:13-15.

18

"every day."[115]  Beatrice, though not physically present, "pa[id] the bills" and "order[ed]" inventory.[116]  The Clymers' children, including Michael, also helped run Muzzi's.[117]

The Clymers also made improvements to the Building between 2015-2018.[118] Don testified to "increase[ing] the size of [the Building]," adding "a propane station, storm door, storage room," "walk-in cooler," "shelves," and a "lean-to."[119]  The lean-to and the addition of concrete slab in the parking lot—all improvements performed by Izzo & Sons—totaled over $15,000.[120]

At some point during Muzzi's operation between 2015 and 2016, an RV was hooked up next to the Building (the "RV").[121]  The RV served several purposes.  Don testified that while running the business in the summers, it "would get real hot out there", and there wasn't any place to get out of the heat. So [the Clymers] could go

---

[115] Tr. 62:21, 924:24-925:2. *But see* Tr. 920:5-8.

[116] Tr. 273:1-8.

[117] Tr. 275:8-11, 367:1-3, 920:5-8.  Michael, Beatrice, and Don all testified that Michael is not paid for his work directly. Tr. 111:9-16, 275:15-20, 382:3-18.

[118] Tr. 63:23-64:1.

[119] Tr. 64:4-67:7; PX 13, at 146-151.

[120] PX 13, at 147, 149-50. The Clymers did not produce permits for the improvements made after 2015. Tr. 139:16- 141:5. Don testified that he paid for the materials for this expansion and Nancy did not dispute that assertion at trial.  Tr. 379:3-4; 873:1-4.  In addition to the improvements to the Building, the Clymers paid the property taxes on the Property in 2019. PX 13, at 168. The tax bill was $994.96, and Don testified that he has paid the property taxes on the Property in other years as well. Tr. 70:1-15, 839:21-840:4.

[121] Tr. 70:19-21.

19

in there and eat lunch" in the "air conditioning" and "cool down."[122]  Per Don

Michael would also sleep in the RV after making trips to "Philadelphia in the middle

of the night" to buy produce.[123]  Tony testified that he helped Michael hook the RV

up to Nancy's sewer line.[124]

### G.    The 2020 Transfer

Although Nancy enjoyed some benefits from Muzzi's, she did not like the

expansion.[125]  Per Nancy, "[the Clymers]… did not listen" when she told them "to

leave things the way they were."[126]  Nancy would "put curtains up and pull her

shades down so she didn't have to see the mess that was down in front of [her]."[127]

The Clymers, however, do not recall a single instance of Nancy objecting to their

---

[122] Tr. 71:1-4.

[123] Tr. 71:4-11.

[124] Tr. 478:24-479:3.

[125] Nancy enjoyed free produce from the stand over the years such as fruit, tomatoes, and bacon.  Tr. 893:1-12. *See also* PX 20. Additionally, Don testified that Nancy and Anthony both "took whatever they wanted" and one occasion they gave Nancy an Amish rocking chair.  Tr.  49:1-2, 49:14-17.

[126] Tr. 886:23-887:1.

[127] Tr. 887:3-5.  During the time of the expansion, Nancy was also struggling with her health.  In or around 2018, Nancy suffered a heart attack and needed surgery.  Tr. 364:13-15, 878:1-3.  Following her release from the hospital, Michael moved in with her until about 2020 when COVID-19 started.  Tr.  364:20-22, 878:7-10.  During his time living with Nancy, Michael testified that he had discussions with Nancy about an agreement with his mother regarding the Building but he had "never known about a paper agreement."  Tr. 367:15-21, 420:8-11.

use or expansion of the business between 2009 and 2020.[128]  Nor did Nancy ever request or demand rent from the Clymers for their use of the Building.[129]

But eventually, Nancy reached a breaking point with the Clymers and turned to her son, Joseph.[130]  Joseph had "asked [Nancy] for property before" and had previously "offered to buy [Aunt Bea's] property" but "[Aunt Bea] did not want to sell" her land to him.[131]  Around 2020, frustrated with the Clymers, Nancy said "[she] would like to give [her] house to [Joseph.]"[132]  Joseph spoke with his brothers, and asked them if they wanted the Property or wanted to split it with him.[133]  The same courtesy was not shown to Beatrice, Joseph's sister and Nancy's daughter.[134]  Nor did Nancy or Joseph invite Don or Michael to make an offer on the Property or give the Clymers any notice that Nancy was considering selling the Property.[135]

---

[128] Tr. 63:14-16, 245:16-18. *See also* Tr. 873:14-874:2.

[129] Tr. 892:20-22.

[130] I find Nancy's representation that she transferred the Property to Joseph "so that he always had a home to live in" difficult to believe, particularly given that Joseph already owned real property. *See* PX 18, at 185; Tr. 882:22-883:6.

[131] Tr. 903:2-6.

[132] Tr. 903:2.

[133] Tr. 903:12-20.

[134] Tr. 888:12-15, 967:13-15.

[135] Tr. 885:8-17.

Nevertheless, on August 1, 2020, Nancy deeded the Property to Joseph (the "2020 Deed").[136] The 2020 Deed was prepared by an attorney, Carl W. Heckert, Esquire, and reflected an exchange of $10.00.[137]

When Joseph went to sign the necessary paperwork to complete the transfer, he brought his longtime friend "Curtis."[138] Joseph "told [Curtis] [Nancy] was giving [him] her four acres."[139] Curtis, not Joseph or Nancy, would be the one to tell the Clymers.

Around fall of 2020, while attending a birthday party, Michael ran into Curtis who told him that Joseph was being gifted the Property.[140] Michael reached out to Nancy to confirm, but she did not answer.[141] Thereafter, in September 2020, Michael told his mom, Beatrice, what he had heard from Curtis.[142] On September 26 or 27, 2020, Beatrice called Nancy.[143] During their discussion, Beatrice was

---

[136] RX 8. The 2020 transfer to Joseph was not the first time Nancy had deeded property to her children. In 1998, Nancy deeded Tony and his wife the four acres of land on which they built their home. RX 39.

[137] RX 8.

[138] Tr. 942:3-10.

[139] Tr. 942:15-16.

[140] Tr. 387:18-23.

[141] RX 10; Tr. 388:9-15.

[142] Tr. 311:4-7, 410:17-19.

[143] Tr. 311:4-22.

22

extremely upset and when she asked about the transfer to her brother Joseph, Nancy replied "Ha, ha, I gotcha."[144]

Thereafter, the already tense relationship between Nancy and the Clymers deteriorated. Even Michael, who previously enjoyed a close relationship with Nancy, was having difficulty communicating with her.[145] On October 14, 2020, Michael asked if Joseph had "t[old] [Nancy] not to talk to" him.[146] After Joseph responded "she doesn't want to argue with anyone," Michael replied: "What's there to argue about . . . why can't we come up with a number?"[147] Thereafter, Michael and Joseph agreed to speak in person; they met at the Building on the morning of Sunday, October 18, 2020 (the "October Meeting").[148]

The October Meeting included Joseph, Don, and Michael.[149] The meeting was passionate, but short, lasting only five to ten minutes.[150] At the outset, Joseph

---

[144] Tr. 311:24-312:1. Beatrice did not raise the Agreement with Nancy during that conversation. Tr. 312:2-5. On September 27, 2020, Beatrice texted Joseph asking him what had happened. RX 9. Joseph told her that she "d[idn't] want to hear the truth," to which Beatrice responded "[t]he truth [is] I did want the [P]roperty." *Id.* at 1.

[145] Tr. 367:4-6.

[146] RX 10.

[147] *Id.* Michael testified that he offered a number to help financially secure his grandmother because "[Nancy] was broke and she needed money, and [Michael] wanted to make sure she was taken care of." Tr. 389:1-3.

[148] PX 10.

[149] Tr. 931:12-17.

[150] Tr. 391:19-20. Don admitted at trial to being upset at the October Meeting and to using profanity threat. Tr. 75:24-76:5.

23

proposed leasing the Clymers some of the Property for them to continue to run Muzzi's.[151] Joseph proposed $1,200 per month in-season, or $1,000 if they agreed to cut the grass, and $500 per month in the off-season.[152] This offer upset and insulted Don.[153] He believed that he and Anthony had an understanding and now Joseph "want[ed] [Don] to pay [Joseph] a bunch of rent for [the Building] that [Don] constructed."[154] Yet, neither Don nor Michael mentioned the Agreement to Joseph.[155] Don did, however, threaten to tear down the Building because "it was his and he could do what he wanted with it."[156] The October Meeting ended with no resolution.

Thereafter, Joseph and Michael continued to text about their disputes. Their text conversations were no more successful than the October Meeting. Joseph began with a threat to call the police "if any structure on [the Property] is damaged or tore down."[157] Michael responded by asking Joseph to "[s]end [the] lease."[158] Michael

---

[151] Tr. 931:19-22.

[152] Tr. 392:2-3, 946:12-947:2. Joseph based his figures on his own research of what nearby produce stores rented for and presented those figures to the Clymers. Tr. 946:4-7.

[153] Tr. 76:3.

[154] Tr. 75:20-23.

[155] Tr. 122:8-10, 933:15-22.

[156] Tr. 420:21-24.

[157] RX 10.

[158] *Id.*

again told Joseph to "send your lease" after Joseph demanded that Michael remove the RV from the Property.[159]

Thereafter, on October 29, 2020, Joseph delivered a letter to Muzzi's, care of the Clymers and Michael (the "October Letter").[160] The October Letter notified the Clymers that any previous rental "agreement is terminated" and that they must "vacate the property on or before [December 31, 2020]."[161] The Clymers did not comply and Muzzi's operated in the summers of 2021 and 2022.[162]

## II.    PROCEDURAL POSTURE

Rather than vacate the Front Acres, the Clymers initiated this action on January 4, 2021, stating various claims against Nancy and Joseph (the "DeGirolanos").[163] Much ink has already been spilled in this case and I direct interested readers to the procedural posture provided in Vice Chancellor Fioravanti's May 27, 2021 orders.[164] Through those orders, Vice Chancellor Fioravanti granted a preliminary injunction prohibiting the DeGirolanos from (1) interfering with the Clymers' operation of the business on the Front Acres, (2) entering the Front Acres

---

[159] *Id.*

[160] PX 16.

[161] *Id.*

[162] Tr. 61:20-22.

[163] D.I. 1.

[164] D.I. 70-71.

in a way that disturbs the Clymers' use thereof, and (3) selling or otherwise encumbering the Property.[165] That injunction remains in place.[166]

I briefly address the posture that followed entry of that preliminary injunction. On August 16, 2021, the Clymers filed their amended complaint (the "Amended Complaint").[167] The Amended Complaint added a claim for breach of the implied covenant of good faith and fair dealing against Nancy and removed the Clymers' claim of adverse possession.[168] Altogether the Clymers pled the followings claims: (1) specific performance of a contract; (2) specific performance of a promise to convey a gift; (3) promissory estoppel; (4) constructive trust; (5) resulting trust; (6) conversion; (7) unjust enrichment; (8) conspiracy; (9) tortious interference with a contract; (10) breach of contract; (11) recission; (12) declaratory judgment; and (13) breach of the implied covenant of good faith and fair dealing.[169] On September 7, 2021, the DeGirolanos answered the Amended Complaint and pled counterclaims

---

[165] *See* D.I. 71.

[166] Vice Chancellor Fioravanti was brought back into this action through a September 21, 2021 limited reassignment to hear the competing motions for rules to show cause. *See* D.I. 88. On February 22, 2022, Vice Chancellor Fioravanti ruled from the bench and followed up with written orders confirming that the Clymers' motion should be granted, and the DeGirolanos' denied. D.I. 118-119, 122. He also denied the DeGirolanos' motion for reargument and awarded fees. D.I. 124, 127. On October 19, 2022, I granted an order increasing the injunction bond. D.I. 156.

[167] D.I. 77.

[168] *Id.*

[169] *Id.*

for fraud and declaratory relief.[170]  The Clymers answered the counterclaims on September 9, 2021, closing the pleadings.[171]

On September 30, 2021, Master Griffin entered a schedule setting trial for June 14-16, 2022.[172] At the June 7, 2022 pretrial conference, Master Griffin recommended, over the DeGirolanos' objection, that the Clymers' expert be permitted to testify and directed the parties to meet and confer on a revised schedule and new trial date.[173]  On August 25, 2022, this case was reassigned to me.[174] Trial was promptly rescheduled for December 2022.[175]  Trial proceeded as scheduled on December 5, 7, and 9, 2022 and was extended an extra day, concluding on December 13, 2022.[176]  Post-trial briefing was completed on March 22, 2023, at which time I took this matter under advisement.[177]

## III.   ANALYSIS

The parties briefed nine (9) issues post-trial: (1) whether the Agreement is binding and enforceable, (2) whether the Clymers are entitled to specific

---

[170] D.I. 82.

[171] D.I. 84.

[172] D.I. 91.

[173] D.I. 131, 145.

[174] D.I. 148.

[175] *See* D.I. 149-150.

[176] D.I. 168.

[177] D.I. 175-76, 178.

performance of the Agreement, (3) alternatively, whether the Clymers are entitled to specific performance of a gift, (4) alternatively, whether the Clymers should prevail under the promissory estoppel lens, (5) whether the Clymers have demonstrated the need for a constructive trust over the Front Acres to prevent unjust enrichment, (6) whether the Clymers have demonstrated the need for a resulting trust, (7) whether the DeGirolanos conspired to deprive the Clymers of their interest in the Front Acres, (8) whether Nancy breached the implied covenant of good faith and faith dealing, and (9) whether the 2020 Deed should be rescinded to carry out the intent of the Agreement.[178]

Except for the alleged forgery discussed below, the Clymers bear the burden of proof on these claims. That burden, except for the specific performance request, is proof by a preponderance of the evidence.[179] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing

---

[178] The arguments and claims not briefed (including the Clymers' claim for tortious interference, the DeGirolanos' counterclaims, and both sides' request for attorneys' fees) should be considered waived. *Emerald P's v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[179] *In re Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) *aff'd* 991 A.2d 1153 (Del. 2010) ("Typically, in a post -trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard.").

force and makes you believe that something is more likely true than not."[180] For their specific performance request, the burden on the Clymers is clear and convincing evidence.[181] Clear and convincing evidence "produce[s] in the mind of the fact-finder a firm belief or conviction that the allegations in question are true."[182]

I address the nine (9) remaining issues in the following order. First, I address whether the Agreement is an enforceable contract; I find it is, in part. Then, I turn to whether Nancy breached, revoked, or repudiated the Agreement and the consequences thereof, including whether there are any equitable bars to the Clymers' claims. I find Nancy did revoke or repudiate the Agreement, but laches should bar the Clymers' claims. That brings me to the 2009-2010 reopening and the October Letter to vacate; I find the reopening was through a revocable license, Joseph revoked that license, and, as such, Joseph is entitled to reasonable rent from the injunction bond, less the Clymers' improvements to the Building.

---

[180] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (quoting Del. P.J.I. Civ. § 4.1 (2000)).

[181] *Osborn*, 2009 WL 2586783, at *5 ("The burden of persuasion on a claim for specific performance is higher than the preponderance of the evidence: entitlement to specific performance must be proved by clear and convincing evidence.").

[182] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002) (quoting 29 Am. Jur.2d *Evidence* § 157 (1994)).

## A. The Agreement is an enforceable license.

I start with the predicate underlying this action—whether the Agreement is an enforceable contract and what duties and obligations it imposes on the parties. "The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."[183] I address these elements in turn and find the Agreement is an enforceable contract, but not for the transfer of real property; it was merely a license to use the Front Acres and the Building.

### i. The parties intended to be bound.

On its face, the Agreement reflects all parties' intention to be bound through their signatures.[184] The DeGirolanos argue, however, that Nancy's signature was forged. I find the DeGirolanos bore the burden to prove such forgery and they failed to meet it.

The DeGirolanos argue that the Clymers bear the burden of proving that Nancy's signature is genuine. In doing so, they cite decisions from Louisiana, Florida, New Mexico, Michigan, Ohio, and Alabama.[185] Those decisions, the

---

[183] *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012) (citations omitted).

[184] "[A] wet ink, signed version of a contract looks to be solid evidence of a meeting of minds. But it is not evidence so powerful that it negates all other evidence to the contrary." *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019).

[185] D.I. 176, at 133-34 (citing *Excel Finance Camp, Inc. v. Sommers*, 140 So.2d 800 (La. App. 1962); *Barnes v. Boulevard Nat'l Bank of Miami*, 124 So.2d 494 (Fla. App. 1960); *Wight v. Citizens' Bank*, 124 P. 478 (N.M. 1912); *PNC Nat'l Ass'n v. Goyette Mechanical*

DeGirolanos contend, should be given more weight than Delaware authority, which has shifted the burden to challengers. Per the DeGirolanos, the Delaware cases only addressed notarized documents, which should be held to a higher standard; because the Agreement was not notarized, the DeGirolanos argue the burden to prove authenticity rests with the Clymers. I disagree.

As recognized by Vice Chancellor Fioravanti, "[t]he weight of authority in Delaware indicates that the [DeGirolanos] bear the burden of proving that Nancy's signature was forged."[186] That is because alleged forgery in the civil context operates as a fraud claim.[187] The burden of proof in any fraud claim is on the party claiming fraud.[188]

The Delaware Supreme Court held as much in *Killen v. Purdy*.[189] Therein, parties to a purported agreement to transfer real property alleged that their signatures on the agreement and deed were forged. The Supreme Court reasoned that such

---

*Co., Inc.*, 140 F. Supp. 3d 623 (E.D. Mich. 2015); *R.C. Olmstead, Inc. v. GBS Corp.*, 2009 WL 4981226 (Ohio App., Dec. 18, 2009); *Sherman Intern. Corp. v. Summit General Contractors, Inc.*, 848 So.2d 263 (Ala. App. 2002)).

[186] D.I. 70.

[187] *See Killen v. Purdy*, 99 A. 537, 538 (Del. 1916) (treating alleged forgery as a claim of fraud).

[188] *Grzybowski v. Tracy*, 2013 WL 4053515, at *4 (Del. Ch. Aug. 9, 2013), *judgment entered*, (Del. Ch. 2013).

[189] 99 A. at 538.

31

claims reflected an overarching theory that the documents were "procured through fraud" and, as such, held the complainants to their burden to prove such fraud.[190]

This burden "shift" has also been recognized with alleged forgeries on other types of documents. For example, "[o]ne who relies upon forgery to challenge the validity of a will has the burden of proving such forgery in a clear, direct, precise, and convincing manner."[191] The same is true for challenges to proxies and stock transfers. As then-Vice Chancellor Seitz recognized, "a strict rule of proof should be required in this court of those who would have a proxy invalidated on the ground of forgery in the execution thereof."[192]

Missing from these holdings is any indication that the burden was shifted due to notarization of the allegedly fraudulent documents. Vice Chancellor Seitz did not predicate his ruling on whether the proxy signature was notarized, neither did the judicial officers analyzing wills, deeds, and stock certificates.[193] Notarization was

---

[190] *Id.*

[191] *In re Melori*, 1987 WL 6442, at *6 (Del. Ch. Feb. 11, 1987).

[192] *Inv. Associates v. Standard Power & Light Corp.*, 48 A.2d 501, 512 (Del. Ch. 1946), *decree aff'd*, 51 A.2d 572 (Del. 1947). *See also Tuggle v. Am. Fin. Sys., Inc.*, 1978 WL 21995, at *1 (Del. Ch. June 22, 1978) (allocating the burden of proving forgery to the party claiming same).

[193] *See Melori*, 1987 WL 6442, at *6 ("One who relies upon forgery to challenge the validity of a will has the burden of proving such forgery."); *Standard Power*, 48 A.2d at 512 ("[O]ne attacking a proxy bearing the names of both tenants must be prepared to assume the burden of demonstrating to this court that the person signing the proxy…was not authorized to sign."); *Tuggle*, 1978 WL 21995, at *1 (holding that the plaintiff

simply not a factor in those decisions, which support a broader rule: in the civil context, the party alleging a document was procured by fraud or forgery bears the burden of proving such. Thus, I find, the DeGirolanos bore the burden of proving Nancy's signature on the Agreement was forged. They failed to meet that burden.

Whether the Agreement contains Nancy's genuine signature was addressed through competing experts J. Wright Leonard, the DeGirolanos' expert, and Robert Lesnevich, the Clymers' expert. Ms. Leonard analyzed approximately twenty sample signatures, executed between 1991 to 2003.[194] The samples were collected by Nancy and provided to Ms. Leonard by Joseph.[195] Ms. Leonard found "unexplained differences" between Nancy's sample signatures and Nancy's signature on the Agreement.[196] Ultimately, she concluded that "the [Agreement] signature . . . was not executed by the same hand that executed the comparison specimens."[197]

Mr. Lesnevich disagreed. He performed a "technical review" on Ms. Leonard's report and examined the same sample checks.[198] Mr. Lesnevich testified

---

challenging a stock sale sustained her burden of proof at trial that her signature was a forgery).

[194] Tr. 627:18-22; RX 27, at 4.

[195] *Id.* Joseph testified that he directed Nancy to collect checks "of [1997], before that year, after that year." Tr. 950:15-16.

[196] RX 27, at 5.

[197] *Id.*

[198] PX 22, at 241; Tr. 732:18-20, 734:11-24.

33

that, in his professional opinion, Ms. Leonard's conclusion was "not supported by the evidence."[199] He noted that "external factors" (like the type of pen or table surface) and "internal factors" (like age, health, or medications) can "affect the writing act," which necessarily precludes the signature variations between the samples and the Agreement from being "unexplained."[200]

I found both experts to be credible witnesses, knowledgeable in their field. But Ms. Leonard was not more convincing than Mr. Lesnevich. Thus the expert testimony alone, the DeGirolanos failed to meet their burden to prove forgery. The only other evidence of forgery is the unbelievable story proffered by Gene and Nancy. Nancy's recollection of the morning the Agreement was signed (which she terms a routine morning), particularly when compared to her inability to remember other more recent matters, is not credible. Neither is Gene's story that he was asked to forge Nancy's signature, declined, and witnessed Ron Sr. doing so, without practice or preparation. Given the similarities between the signature on the Agreement and Nancy's known samples, I find it unlikely that Ron Sr. signed for Nancy as Gene purports. Further, Gene's belated recollection, motivation to assist his mother, and admitted participation in dishonest conduct in the past undermines his credibility.

---

[199] PX 22, at 241.

[200] *Id.* at 274, 284; Tr. 740:16-20, 745:14-23.

Altogether, I find the DeGirolanos have failed to prove that it is more likely than not that Nancy's signature on the Agreement is a forgery. Rather, the weight of the evidence supports the opposite: I find it more likely than not that Nancy's signature on the Agreement is genuine.

### ii. The Agreement lacks all material terms to be an enforceable agreement for the sale of real property; it contains all materials terms for a license.

The Agreement purports to be an agreement for the transfer of real property. The material terms for such agreements are "price, date of settlement, and the property to be sold."[201] These terms also must be sufficiently definite. "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."[202] "Where essential terms are lacking, a court is not permitted to insert its own judgment and terms as it is a fundamental principle of equity that the remedy of specific performance will only be granted as to an agreement which is clear and definite and as to which there is no need to ask the court to supply essential terms."[203]

---

[201] *River Enterprises, LLC v. Tamari Properties, LLC*, 2005 WL 356823, at *2 (Del. Ch. Feb. 15, 2005).

[202] *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018).

[203] *Pharmathene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *10 (Del. Ch. Nov. 23, 2010) (cleaned up).

Vice Chancellor Parsons' pleading-stage ruling in *Black Horse Capital, LP v. Xstelos Holdings, Inc.* demonstrates the definitiveness required, particularly in a specific performance action.[204] Therein, the plaintiffs sought to enforce an oral agreement for the sale of patented drug technology. But the plaintiffs failed to plead sufficient factual predicate that the parties reached agreement on the definition of the specific asset(s) to be transferred.[205] Such was "a vagueness that . . . any court would be ill-equipped to resolve."[206] Thus, the request for specific performance of the vague agreement was dismissed at the pleadings.

Here, the Agreement should fair no better. In the Agreement, the date of settlement and property to be sold are not definite. One cannot ascertain from the face of the Agreement when and what portion of the Property was to transfer to the Clymers.[207] Thus, it is not an enforceable agreement for the immediate or future transfer of the Front Acres.[208]

---

[204] 2014 WL 5025926, at *1 (Del. Ch. Sept. 30, 2014).

[205] *Id.* at *18.

[206] *Id.* at *19.

[207] The Agreement suffers from a further defect in that Anthony purports to transfer property he does not own; Anthony was not added to the deed for the Property until April 10, 1997. PX 4.

[208] This lack of specificity further dooms the Clymers' alternative theory that the Agreement was a promise to gift, or that promissory estoppel applies, and differentiates this case from *Mazzetti v. Shephard*, 1987 WL 9367 (Del. Ch. Apr. 6, 1987). There, Chancellor Allen found an enforceable agreement by a father to convey a future interest in real property to his son. *Id.* at *1. The Chancellor held the claimant to a clear and convincing evidentiary burden, and found the father promised disposition of specific

The Agreement does, however, have all terms that would be material to create a license. "A license with respect to real property is 'a privilege to go on the premises for a certain purpose, as, for example, the purpose specified in the instrument creating the license; it does not operate to confer on, or vest in, the licensee any title, interest, or estate in such property.'"[209] The terms material to such an interest, I find, are the general premises available and for what specific purpose.[210]

I find Vice Chancellor Short's analysis in *Timmons v. Cropper* helpful in drawing this distinction.[211] Therein, the Vice Chancellor focused on whether the alleged lease covered an identifiable space and specified exclusive possession.

---

property, the son acted on that promise to his detriment (representing legal consideration), and, as such, the promise was enforceable. *Id.* at *4. Here, the Clymers have failed to prove that Nancy, more likely than not, promised disposition of the Front Acres to them. Thus, the Clymers' involvement in constructing and using the Building from 1997-1999 cannot serve as part performance or consideration toward a promise not made; rather, such was conduct expressly within the license granted.

To the extent the Clymers seek to save the unenforceable property-transfer portion of the Agreement through their implied covenant claim, that argument is rejected. *See Kuroda v. SPJS Hldgs., LLC*, 283 A.3d 1099, 1118 (Del. 2022) ("The implied covenant cannot be invoked to override the express terms of the contract."); *Encite LLC v. Soni*, 2008 WL 2973015, at *12 (Del. Ch. Aug. 1, 2008) ("The implied covenant of good faith and fair dealing 'attaches to every contract.' That no such covenant can exist in the absence of a contract is the obvious, and logical, corollary to this fundamental proposition.") (citations omitted).

[209] *Timmons v. Cropper*, 172 A.2d 757, 759 (Del. Ch. 1961) (quoting 53 C.J.S. Licenses § 84, p. 810).

[210] The term for such license is not material because it is "terminable at the will of the owner." *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013).

[211] 172 A.2d 757 (Del. Ch. 1961).

Because it did not, it was a license, not a lease. He explained that "[e]ven where an instrument is denominated as a lease and contains technical words of demise it is not to be construed as such if, in fact, it is something else."[212] The same is true here.

Even though the Agreement purports to be an agreement for transfer of property and contains words indicating property transfer, it fails to contain all material terms for a transfer or real property. But it has the terms necessary to create a license—a portion of the Property is made available for the Clymers to the extent necessary to build the Building and operate their business. It is, thus, a license permitting the Clymers to use an indeterminate space on the Property to build the Building and operate their business, without any promise of ownership or exclusivity.[213]

---

[212] *Id.* at 759.

[213] Because I find the Agreement is not an enforceable agreement for the transfer of real property, I find the Clymers cannot prevail on their claim to rescind the 2020 Deed. Such was expressly predicated on the Clymers' alleged interests arising from the Agreement. *See* D.I. 175, p.53. I also find the unjust enrichment claim unavailing because there is an underlying contract for a license. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) ("Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."). The Clymers' requests for a constructive or resulting trust should also fail because they have failed to prove that they were granted or promised an interest greater than a license. *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654, 676, n.22 (Del. Ch. June 21, 2006) ("Unless a plaintiff can prove out a claim under a recognized cause of action . . . the plaintiff should have no eligibility for any remedy, including the remedy of constructive trust."); *Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999) ("A resulting trust is one that is imposed by a court of equity to give effect to the presumed intentions of the parties."). Further, the Clymers' conspiracy claim relies on an unlawful act, which they cannot establish without an enforceable interest in the Property. *Allied Cap. Corp. v. GC-Sun Holdings L.P.*, 910 A.2d 1020, 1037 (Del. Ch. Nov. 22, 2006) ("[T]o state a claim for

The license granted to the Clymers the privilege to go onto the Property to build the Building and operate their business. It did not convey any present ownership interest, expressly denoting any such transfer would occur "[a]fter the death of Nancy and [Anthony]."[214] But, as explained above, the terms of any such future transfer are not sufficiently definite to be enforceable. The Agreement is only enforceable as a license to use the Property.[215]

### iii. The Agreement reflects the exchange of sufficient consideration.

Finally, I turn to consideration. "Delaware courts define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request."[216] My inquiry into consideration is limited "to its existence and not

---

civil conspiracy, a plaintiff must plead facts supporting . . . an unlawful act was done in furtherance of the conspiracy.").

[214] PX 2.

[215] In so holding, I find the Agreement has two severable provisions—an enforceable one for a present interest (the license) and an unenforceable one contemplating an indefinite future interest (the purported promise to transfer or bequeath). "An invalid term of an otherwise valid contract, if severable, will not defeat the contract." *Hildreth v. Castle Dental Centers, Inc.*, 939 A.2d 1281, 1283–84 (Del. 2007). "Whether or not the terms of a contract are severable is purely a question of the intent of the parties." *Tracey v. Franklin*, 67 A.2d 56, 61 (Del. 1949). "Absent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'" *Fairstead Capital Mgmt. LLC v. Blodgett*, 288 A.3d 729, 759 (Del. Ch. 2023) (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)). Here, neither side argued ambiguity and I find the four corners of the Agreement reflect a definitive present interest and a contingent future interest. The latter indefiniteness, I find, reflects an intent that the two be treated as severable.

[216] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).

whether it is fair or adequate."[217] "A court of equity does not attempt to weigh the actual value nor to insist upon the equivalent in contracts, when each party had equal competence."[218] Here, the consideration of one (1) dollar reflected on the face of the Agreement is sufficient to support a mere license.[219]

## B. Nancy revoked or repudiated the license in 2001 and the Clymers waited too long to assert their interests therein.

The Clymers argue that Nancy breached the Agreement and the implied covenant implicit therein. The DeGirolanos argue that Nancy revoked or repudiated the Agreement and the Clymers are barred from challenging such in this action. I agree with the DeGirolanos.

Ordinarily, licenses are "terminable at the will of the owner."[220] But a license "can vest enforceable rights in the grantee if the court is convinced that the grant of use was reasonably relied upon and that the parties intended the grant to be

---

[217] *Osborn*, 991 A.2d at 1159.

[218] *Glenn v. Tide Water Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch. 1953).

[219] *See also* Tr. 215:3-12. Although there is Delaware case law reflecting the exchange of consideration for licenses to use real property, it is not clear that consideration is required to form such a license. *See Baynard v. Every Evening Printing Co.*, 77 A. 885, 887 (Del. Ch. 1910) (distinguishing a license from a contract); *Jackson v. Philadelphia, W. & B.R. Co.*, 1871 WL 2084, at *7 (Del. Ch. Sept. 1871) (explaining "a mere license affecting lands is at law always revocable, even though granted for a valuable consideration"). *See also* 3 Tiffany Real Prop. § 830 (3d ed. 2022) ("No formality is necessary to establish or create a license. It may be in writing or oral, no particular words being necessary. It may be implied from the relations of the parties, or from the conduct of the landowner, as when he indicates an assent to the doing of certain acts on his land.") (citations omitted).

[220] *Coker*, 2013 WL 1858098, at *3.

permanent."[221] If that reliance is "acted upon in the expenditure of money it becomes a contract for a valuable consideration, to be executed by a Court of Equity as a contract part performed."[222] Whether a license should be held permanent depends on "the intent of the parties, . . . the circumstances of the particular case, and may be wholly countervailed by evidence demonstrative that the privilege in question was in fact granted and accepted not as a perpetual, indefeasible right, but as a voluntary accommodation, to abide the good will and mutual interests of the parties."[223] If a license is held permanent, the property owner can no longer revoke at will and any purported revocation is properly considered repudiation. Under the doctrine of repudiation, "an unequivocal statement by a promisor that he will not perform his promise gives 'the injured party an immediate claim to damages for total breach.'"[224]

Here, the Clymers presented some evidence in support of converting the license into a more permanent, enforceable interest in the Building or the Front Acres.[225] Whatever interest granted to or acquired by the Clymers was either

---

[221] *Hionis v. Shipp*, 2005 WL 1490455, at *4 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006).

[222] *Jackson*, 1871 WL 2084, at *5.

[223] *Id.*

[224] *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *5 (Del. Ch. Jan. 13, 1988).

[225] Although I entertain the possibility, I find it unlikely the Clymers' license was converted to anything more. Like in *Carriage Realty P'ship v. All-Tech Auto Automotive*, 2001 WL 1526301 (Del. Ch. Nov. 27, 2001), the Clymers' license was expressly for the purpose of constructing the Building, thus, that construction would not support converting the license

revoked or repudiated by Nancy in 2001 by the June Letter, wherein Nancy unequivocally revoked whatever permission the Clymers had to use and enjoy the Front Acres and the Building.[226] Either she (1) exercised her authority to terminate, at will, a mere license, or (2) the June Letter was a repudiation of a promise of a greater property interest.

Most importantly, however, is what the Clymers did in response—nothing. When Nancy expressly took away the present rights she conferred by the Agreement, the Clymers failed to act promptly to protect those rights. Rather, from the receipt of the letter in June 2001 until Nancy returned the Building's keys to the Clymers around 2009, they stayed away from the Building and the Front Acres were either vacant or used by others. I find their conduct amounts to laches.

---

into a greater interest. *Id.* at \*9. Absent such, the Clymers have not demonstrated the inequitable conduct necessary to support a finding that they obtained a greater interest in the Building or the Front Acres between 1997 and 2001. *See id.* I find their representations at trial that they would "never put a building on [other's] property without an agreement" represent their thinking now, with the benefit of hindsight, rather than their present intentions in 1997 as reflected in the Agreement. *See* Tr. 284:17-19.

[226] PX 11. In his preliminary injunction ruling, Vice Chancellor Fioravanti held: "At this stage of the proceedings, the record does not suggest that the [June] Letter and Nancy's subsequent conduct were sufficiently unequivocal, positive, and unconditional to constitute a repudiation of the Agreement." D.I. 70, ¶ 17. But, herein, I find that the Agreement is enforceable only as a license and not a promise to gift or bequeath the Front Acres. I agree with Vice Chancellor Fioravanti that the June Letter does not represent a clear repudiation of a future gift or bequeath of the Front Acres. But it does clearly repudiate or revoke any present interest the Clymers had at that time in using the Building and the Front Acres.

Laches will bar "an action in equity if the defendant carries the burden of persuasion that two conditions have been satisfied: (1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant. What constitutes unreasonable delay and prejudice are questions of fact that depend upon the totality of the circumstances."[227] Although "[a] statute of limitations period at law does not automatically bar an action in equity . . . [a]bsent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches."[228]

Here, the analogous statute of limitations is found in 10 *Del. C.* § 8106, which imposes a three-year period of limitations for actions based on contract or promise. That analogous period for claims arising out of Nancy's revocation or repudiation would have run by June 12, 2004, three years after the June Letter.[229] The Clymers

---

[227] *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).

[228] *Whittington v. Dragon Grp., LLC*, 991 A.2d 1, 9 (Del. 2009).

[229] The Clymers have not articulated any basis on which this period would have been tolled. To the extent the Clymers argue their restart in 2010 somehow tolls the period during which they should have sued, I disagree. The Clymers' claim under the Agreement arose in 2001, was arguably exacerbated when Leigh Ann began the candle shop around 2002, and they failed to act timely to protect their interests. On this record, I find regaining access in 2010 was a separate arrangement. *See Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 71 (Del. Ch. 2023) ("Tolling cannot preserve an otherwise untimely claim after the point of inquiry notice.").

43

did not act until January 4, 2021, when they filed this action. I find they waited an unreasonable amount of time to assert their rights under the Agreement.[230]

I turn to prejudice. "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced. Inequity for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit."[231] This type of prejudice and inequity is present here.

Between 2004 (when a timely action should have been brought) and 2021 (when this action was filed) much changed relevant to the Agreement. During this period of delay Anthony, Ron Sr., and Ron Jr.—who were all witnesses to the Agreement and construction of the Building—died. Further, memories of those who survived faded. Even the Clymers forgot about the Agreement over time and went their own ways. Now, this Court is being asked to fill those gaps. This is the type of

---

[230] Arguably, the Clymers should have acted even sooner. "A party asserting a claim for specific performance in this Court, . . . will typically need to act with even greater alacrity than simply within the analogous limitations period." *Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at \*11 (Del. Ch. Feb. 18, 2015).

[231] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 15.07[c][4], at 15-18 (2021).

prejudice laches was meant to ward against.[232]  The Clymers should, thus, be barred from asserting any rights arising from the Agreement.[233]

### C.     Joseph should be permitted to recover reasonable rent from the Clymers, less the cost of improvements made to the Building.

With any challenges to the Agreement barred by laches, I turn to the Clymers' use of the Front Acres after they reopened the business as Muzzi's. I find that use was through a revocable oral license granted by Nancy. In reliance on that license, the Clymers expended funds to improve the Building. Then, after Joseph acquired the Property, he revoked the license. This change of events, to me, leads to two conclusions: (1) Joseph should be paid, from the bond, reasonable rent for the Clymers' use of the Front Acres after the revocation, and (2) that rent should be reduced by the amount of the Clymers' improvements to the Building.

A license—the privilege to use a premise for a specified purpose—can be created orally or through a course of conduct.[234]  Here, Nancy granted a license to

---

[232] *See Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 809 (Del. Ch. Dec. 20, 2007) (explaining the fading of key witnesses' memories and the death of other key witnesses preventing them from testifying was the "sort of evidentiary prejudice" which "clearly supports a finding of laches").

[233] Because I find that laches bars the Clymers' claims, I decline to address the alternative bars of waiver and acquiescence. I further reject the Clymers' argument that Vice Chancellor Fioravanti's preliminary injunction ruling conclusively determined laches—his ruling was expressly predicated on the record before him and qualified by the ability for trial to clarify and change the analysis.  D.I. 70, ¶ 19.  I find it did.

[234] *Carriage Realty P'ship*, 2001 WL 1526301, at *8.

the Clymers sometime around 2009-2010 to use the Building and Front Acres to operate their business. And, although the Clymers demonstrated that they made expenditures to repair and improve the Building, the evidence demonstrated that the license was never intended to convey to the Clymers a perpetual, indefeasibly, exclusive right to use the Front Acres.[235] Thus, I find the license remained revocable at the will of the owner of the Property.[236] Joseph unequivocally exercised the right to revoke in the October Letter.[237]

---

[235] The Clymers' claims all rely on the Agreement. *See, e.g.*, D.I. 175; D.I. 178 at 13-14. The Clymers have not articulated any theory under which Nancy made new promises regarding the reopening. With the 2001 revocation or repudiation, I see the restart as a separate arrangement and reject the argument that Nancy's repudiation was retracted when she gave the Clymers keys in 2009 and allowed them to reopen as Muzzi's. "A repudiation is, of course, the reverse of positive and clear where the promisor *before the time of performance* retracts the repudiation and announces himself prepared to perform his promise." *Carteret Bancorp, Inc.*, 1988 WL 3010, at *6 (emphasis added). Stated another way, where "there is no explicit or implicit acceptance of [a] repudiation (by for example covering or filing suit for breach) and no detrimental reliance on it by the promisee, it is the general rule that such a repudiation can be retracted prior to the agreed time for contract performance." *Cochran v. Denton*, 1991 WL 220547, at *1 (Del. Ch. Oct. 28, 1991), *aff'd*, 612 A.2d 157 (Del. 1992). Here, Nancy repudiated in 2001 and the Clymers accepted the repudiation by vacating the Front Acres and the Building to their detriment. Even if Nancy meant to retract the repudiation (which the evidence does not support) she failed to do so timely. The Agreement was revoked or repudiated in 2001 and claims arising therefrom unenforceable by 2004. The 2009-2010 arrangement was, at most, a new license.

[236] *See Jackson*, 1871 WL 2084, at *5.

[237] PX 16. I trigger revocation of the 2009-2010 license based on Joseph's express direction, rather than the mere transfer of interest to Joseph, following the lead of Vice Chancellor Zurn in *Jones v. Collison*, 2022 WL 414237, at * 2 (Del. Ch. Feb. 11, 2022) (holding that a license is not revoked by the mere conveyance of the servient estate) (citing *Baynard*, 77 A. at 890-92).

Under this Court's injunction, the Clymers were permitted to continue using the Building and the Front Acres during the summer seasons of 2021 and 2022 (and, presumably, are doing so currently). That use was, however, subject to their bond.

> The bond requirement serves two purposes. First, it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without possible insolvency of the assured. Second, it provides the plaintiff with notice of the maximum extent of its liability, since the amount of the bond is the limit of the damages the defendant can obtain for a wrongful injunction, . . . provided the plaintiff was acting in good faith.[238]

To recover from the bond, the DeGirolanos must prove that they were "wrongfully enjoined."[239] A party is wrongfully enjoined "if the enjoined party had at all times the right to do the enjoined act."[240] I find the DeGirolanos met that burden.

Because the only interest the Clymers had in the Front Acres or the Building was a license, revocable at will, I find Joseph had the right to order the Clymers to vacate. Thus, the DeGirolanos should recover injunction damages to cover reasonable rent for the Clymers' use after Joseph's revocation, up to the amount of the bond. But I further find that equity dictates reduction in the rent owed to

---

[238] *Concerned Citizens of Estates of Fairway Vill. v. Fairway Cap, LLC*, 256 A.3d 737, 744 (Del. 2021) (cleaned up).

[239] Ct. Ch. R. 65(c).

[240] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1226 (Del. 1999).

accommodate for the repairs and improvements made by the Clymers to the Building post-2009.

In striking this balance, I find then-Vice Chancellor Strine's decision in *Carriage Realty Partnership v. All-Tech Auto Automotive* most persuasive.[241] Therein, the Vice Chancellor found that a property owner's permission to a lessee to build a fence was, at most, a license.[242] Looking to the parties' negotiations, the Vice Chancellor found the fence builder "extracted nothing more than an indefinite promise to permit construction of the fence."[243] Thus, the agreement was "insufficient to create a property right" and the builder had only a license.[244] Because the license was expressly to construct a fence and there was no fraud or other support for a greater claim, the construction alone did not convert the license into anything more.[245] But the Vice Chancellor did not stop there. Although he recognized the property owner had the right to revoke the license at any time, he nonetheless shifted the cost of removing the fence to such owner.[246] He reasoned, the property owner "stood by and let [the other side] erect an expensive fence designed to last for

---

[241] 2001 WL 1526301 (Del. Ch. Nov. 27, 2001).

[242] *Id.* at *8.

[243] *Id.* at *9.

[244] *Id.*

[245] *Id.*

[246] *Id.*

years[,]" and "equity therefor suggests that [the property owner] should bear the costs of removal."[247]

I invoke the same reasoning here. Nancy permitted the Clymers to use the Building and the Front Acres for their business. It was a permissive license revokable first at Nancy's, then at Joseph's, will. But the DeGirolanos also stood by while the Clymers made improvements and repairs to the Building on the Front Acres. Equity supports reimbursement thereof. Because specific information regarding the Clymers' use since the injunction, and any 2023 improvements, is not in the record before me, I do not attempt to quantify the rent/reimbursement offset herein. Rather, I find the parties should meet and confer and propose a joint or competing order(s) regarding such offsetting damages.

## IV.    CONCLUSION

For the foregoing reasons, I find the Clymers only had a license to operate their business on the Front Acres and in the Building. Any claims they might have had when Nancy first asked them to vacate in 2001 are time barred. The only relief available to them due to Joseph's similar request is reimbursement for improvements made after 2009. That reimbursement should be offset by the reasonable rent owed to Joseph, up to the amount of the injunction bond.

---

[247] *Id.*

This is my final report and exceptions may be filed under Court of Chancery Rule 144. Any stay of exceptions to interlocutory orders is hereby lifted. If this becomes an order of the Court, the proposed order(s) contemplated above should be submitted within twenty (20) days of finality.